Joseph A. Cox, S.
The testator, through corporations which he controlled, was the owner and publisher of two of the nation’s leading newspapers, the New York World and the St. Louis Post-Dispatch. He executed his will in 1904 and a first codicil thereto in 1909 and in the sixth article of the latter instrument he created a testamentary trust of his capital stock in the newspaper publishing companies. This trust, which became effective following the testator’s death in 1911, has been referred to during the course of the estate’s administration as the ‘ ‘ newspaper trust ’ ’ to distinguish it from other trusts created by the will. Its term, measured upon the lives of the testator’s two youngest sons, has come to an end and the trustees have asked that a judicial determination be made as to the disposition of the trust remainder.
The testator’s purpose in creating the newspaper trust was not only to provide for members of his family but to preserve, perfect and perpetuate his New York newspaper in accordance with standards established in his lifetime- and in keeping with his characterization of the publication as a “public institution”. The testator emphatically urged his male descendants to carry on his purposes and, consistent with the obligations which he expected them to assume, he granted the financial benefits to be derived therefrom to his male descendants with provision for female descendants only in the contingency that they were his only living issue. This preferment of male *736 descendants exists in respect of both income and principal but it is only with the ultimate disposition of the latter that we are concerned.
In the existing circumstances of survivorship, the failure of any son to survive the trust term, the controlling* testamentary direction is found in subdivision (a) of article (4) of the codicil which provides: “ (4) Upon the expiration of the ‘ trust term’ — (a) if at that time no son survives me to divide the said stock into as many portions as I leave then surviving male descendants of any son or daughter, such male descendants to take per stirpes and not per capita, and to transfer and deliver one of such portions to the living male descendants of each one of my sons and daughters in equal parts or if there be no living male descendants, then to transfer and deliver such shares among all my descendants then living per stirpes and not per capita, share and share alike.”
The testator had five children, three sons and two daughters, all of whom survived him. His other descendants living at his death were two grandsons, the issue of his oldest son. One of these grandsons was born in 1906 and the other in 1911 a few weeks before the testator’s death. In the years following the testator’s death issue was born to each of his children and when the newspaper trust came to an end the living descendants of the testator were a daughter, 14 grandchildren, 25 great-grandchildren and 3 great-great-grandchildren.. The living male descendants of the testator number 21. Of these eight are grandsons. Two of the grandsons are children of the testator’s deceased son Ralph, two are children of the testator’s deceased son Joseph, one is the child of the testator’s deceased son Herbert, one is the child of the testator’s deceased daughter Constance Pulitzer Elmslie and two are children of the testator’s living daughter Edith Pulitzer Moore. Five of the testator’s great-grandsons trace their relationship through their maternal parents. Two of these are the sons of a daughter of Joseph Pulitzer, Jr., and three are the sons of a daughter of Constance Pulitzer Elmslie. There also are eight great-grandsons who trace their relationship through living paternal parents.
The remainder gift is to the male descendants of the testator’s children or, in other words, to grandsons and males more remote than grandsons in the line of descent. Were the will silent as to the method of apportioning the gift among such descendants, it could be contended, in view of the date of the codicil, that such distribution should be made on a per capita basis but this testator by stating in most explicit language that distribution *737 is to be made per stirpes and not per capita has closed the door to either controversy or speculation as to his intent (Soper v. Brown, 136 N. Y. 244; Matter of Farmers’ Loan & Trust Co., 213 N. Y. 168; Matter of Durant, 231 N. Y. 41). The simple meaning of his direction is that division is to be made according to stocks with the male descendants taking by representation from a stock or root so that the immediate descendants of a deceased ancestor take to the exclusion of more remote descendants (Van Cott v. Van Cott, 167 App. Div. 694, affd. 219 N. Y. 673; Matter of Lawrence, 238 N. Y. 116). Whatever ambiguity can be said to exist in the testamentary language, it is not of a nature to challenge the direction for stirpital distribution. Any contention that all of the 21 male descendants participate equally, irrespective of degree of kinship, cannot be raised upon a solid base.
Some of the language of the codicil can be said to raise doubt as to the level at which the primary division in the per stirpes formula is to be made. The testator’s preliminary instructions, ‘ ‘ to divide the said stock into as many portions as I leave then surviving male descendants of any son or daughter, such male descendants to take per stirpes ”, is an adequately clear direction to divide the trust remainder into portions corresponding in number to the number of lines of descent proceeding from the testator’s sons and daughters and containing male descendants. Reading the testator’s further instructions, “to transfer and deliver one of such portions to the living male descendants of each one of my sons and daughters in equal parts ’ ’, the impression can be obtained that there the reference is to portions corresponding in number to the number of the testator’s children, a plan of distribution which would correspond to that intended to be effective in the absence of male descendants. If there is confusion of expression in the full text of subdivision (a) of the codicil it would seem that any ambiguity should be resolved by the dominant intention to make a remainder gift directly to the descendants of the testator’s children upon a stirpital basis. The testator was not making either a gift to his children or through his children but instead, a gift to his children’s descendants. The person most closely related to the testator who could qualify as a recipient would be a grandson and, inasmuch as there were grandsons surviving the trust’s expiration, the number of major portions or roots into which division is required to be made is determined by the number of grandchildren surviving the trust term (whether such grandchildren were males or were females each with one or more male descendants), plus the number of deceased grand *738 children then survived by one or more male descendants. This construction requires that the trust remainder be divided into 10 original portions. Eight of such portions are payable to the eight grandsons. One of such portions is distributable in equal shares to the three male great-grandchildren whose mother is Cynthia E. Weir and another share is distributable in equal shares to the two male great-grandchildren whose mother is Kate D. Quesada.
The opinion of Mr. Surrogate Collins in Matter of Pulitzer (1 Misc 2d 876) with respect to the status of a male descendant claiming relationship to the testator through a living maternal parent was confined to the payment of trust income and for that reason is not here controlling but the reasoning of that decision and the analysis there made of the testator’s intention are equally applicable to the disposition of the trust remainder.
The two grandsons of the testator who were born in his lifetime survived the trust term. One of them contends that it was the testator’s purpose to leave the trust remainder in equal shares to those of his now living male descendants who were in being in his lifetime. The grandson so contending claims a one-half share of the trust remainder. The other grandson does not so contend but instead recommends the result reached herein by the court. To the mind of the court, the claim to a one-half share of the remainder is premised upon a strained and unrealistic reading of a limited number of words in the codicil without due regard to their context or to the predominant testamentary purpose which is apparent from a reading of the full text.
The temptation to be critical of a testamentary draftsman often may arise when the problems of will construction have materialized but the consistent effort of the courts has been to sustain testamentary wishes and to avoid intestacy, even in part (Vanderpoel v. Loew, 112 N. Y. 167; Meeks v. Meeks, 161 N. Y. 66; Matter of Hayes, 263 N. Y. 219; Matter of Lyons, 271 N. Y. 204; Matter of Forde, 286 N. Y. 125). A female descendant of the testator asserts that there is a partial failure of the remainder gift with a resulting partial intestacy in which she participates. Her argument in sum is that the codicil is clear, concise, unambiguous and incomplete, but the court is unable to discern the omission or deficiency for which this party contends and the court will not resort to overliteralness to accomplish a destruction of the testamentary provision (Matter of Hinchman, 141 App. Div. 95, 98). A claim of intestacy also is made on behalf of other female descendants but here the claim is that the codicil is so ambiguous and uncertain as to discourage any effort to resolve its meaning. Here again the court is unwilling *739 to adopt the suggestion that the interpretation of the testamentary language is a task impossible of accomplishment. It is to be conceded, as hereinbefore mentioned, that some ambiguity exists but it is one permitting a choice of alternatives neither of which leads to an intestacy.
Proceed accordingly.