[Civ. No. 21690. First Dist., Div. One. Oct. 19, 1964.]

MARY NICKEL LOMBARDI, Plaintiff, Cross-defendant and Appellant, v. MARSDEN S. BLOIS, as Trustee, etc., et al., Defendants, Cross-complainants and Respondents.

MARSDEN S. BLOIS, as Trustee, etc., et al., Plaintiffs and Respondents, v. MARY NICKEL LOMBARDI et al., Defendants and Appellants.

(Consolidated Cases.)

James Martin MacInnis, Thomas Keister Greer, R. E. H. Julien, C. Ray Robinson, John Lockley, Duane W. Dresser, Mary C. Fisher, Arthur B. Dunne and Charles W. Burkett, Jr., for Appellants.

Hagar, Crosby & Rosson, Gerald H. Hagar, Justin M. Roach, Jr., John F. Duff, Pillsbury, Madison & Sutro, Turner H. McBaine, Thomas E. Haven and Stephen A. Nye for Respondents.

SULLIVAN, P. J.—We review the final apportionment of the fortune[1] of Henry Miller amassed from a fabulous empire of land and cattle and preserved for his posterity within the impregnable walls of a trust for half a century. Two competing bands of remaindermen in this last engagement clash

---

[1]Although the instant record does not disclose the value of the trust estate here in controversy, counsel for some of the parties estimate it at $40,000,000.

over their respective shares in the corpus. As we shall explain, we have concluded that the amount of these shares was correctly determined by the trial court. We therefore affirm the judgment.

The facts are not in dispute. On April 17, 1913, Miller executed a deed of trust under which he transferred most of his fortune, including all of his shares of stock in Miller & Lux, Inc. to his daughter Nellie Miller Nickel and her husband J. Leroy Nickel as trustees in trust for his family, subject first to the payment of the income thereof to the trustor for life. On the same day he executed a will creating a testamentary trust with virtually identical provisions.[2] Under the terms of the *inter vivos* trust, so far as here pertinent, all of the trust income with certain exceptions not here material was to be paid after Miller's death to "Nellie Miller Nickel, and her husband, J. Leroy Nickel, share and share alike during their natural lives, and to the survivor of them during the natural life of such survivor." Upon their deaths, the income was to be paid "equally to the children of the said Nellie Miller Nickel and J. Leroy Nickel and the issue of any deceased child born in lawful wedlock, per stirpes, during the lives of such of said children, as are living at the time of the death of said party of the first part [Henry Miller]." Upon the death of any of such children leaving issue "born in lawful wedlock them surviving," the share of such child in the income was to be paid to such issue, but if such child left no lawful issue, "the share of said child shall go to the other of said children and issue of any deceased child per stirpes and not per capita."

The trust further provided that upon the death of Nellie Miller Nickel and J. Leroy Nickel and all of their children living at the time of Henry Miller's death, the corpus, with certain exceptions, "shall pass to, vest in, and is hereby conveyed to the descendants born in lawful wedlock of the said Nellie Miller Nickel and J. Leroy Nickel, per stirpes and not per capita, absolutely and free of all trusts, . . ."

Henry Miller died on October 14, 1916, survived by his daughter Nellie Miller Nickel, her husband J. Leroy Nickel and three of their four children, George W. Nickel, J. Leroy Nickel, Jr., and Beatrice Nickel Bowles Morse, a fourth child, Henry Miller Nickel having predeceased Henry Miller on

---

[2]Absent of course from the testamentary trust are those provisions dealing with the payment of income to the trustor for life. The testator also executed a codicil dated June 4, 1913, the provisions of which have no bearing on the instant matter.

February 7, 1909, leaving no issue. J. Leroy Nickel died on June 17, 1937, whereupon all of the trust income was paid to Nellie Miller Nickel. The latter died on July 31, 1944, at which time, pursuant to the provisions set forth above, the income was paid in equal shares to George W. Nickel, Beatrice Nickel Morse and J. Leroy Nickel, Jr. Upon the death of the last named person without issue on May 28, 1959, the income was paid in equal shares to George W. Nickel and Beatrice Nickel Morse. George W. Nickel died on February 23, 1962, whereupon the income was paid one-half to Beatrice and one-half to the issue of George, that is one-eighth ($\frac{1}{8}$) each to Sally Nickel Mein, George W. Nickel, Jr., and Mary Nickel Lombardi, son and daughters of George W. Nickel, and one-eighth ($\frac{1}{8}$) in equal shares to Nina Beverly Nickel and John Charles Nickel, as the surviving issue of John Beverly Nickel, the fourth child of George W. Nickel, who predeceased him on November 24, 1954.

Beatrice Nickel Morse, the last survivor of the children of Nellie Miller Nickel and J. Leroy Nickel living at the time of the death of Henry Miller, died on December 11, 1962, thereby terminating the trust and in accordance with its provisions making the corpus distributable to the "descendants" of Nellie and her husband "per stirpes and not per capita, absolutely and free of all trusts." Those descendants, as we have indicated, fall into two groups: (1) the issue of Nellie's son George, appellants herein, hereafter referred to as the Nickel remaindermen;[3] and (2) the issue of Nellie's daughter Beatrice, respondents herein, hereafter referred to as the Bowles remaindermen.[4]

The single question presented is what is the share of each remainderman in view of the trustor's direction that the corpus shall go to the descendants of Nellie Miller Nickel and J. Leroy Nickel per stirpes and not per capita. The Nickel remaindermen contend that the first generation of takers, namely Nellie Miller Nickel's seven grandchildren, constitute the "stirpes" or family roots and that the corpus should be divided into seven equal parts at the level of the grand-

[3]Nina Beverly Nickel and John Charles Nickel, the issue of John Beverly Nickel, deceased, appear herein by their general guardian Nancy Burkett Nickel.

[4]The following chart shows the above-mentioned descendants of Nellie Miller Nickel and J. Leroy Nickel, including the beneficiaries of the Henry Miller trust and the two groups of remaindermen now before the court, the names of the last mentioned being underlined. All data appearing therein, including the identities and relationship of the persons

children, each living grandchild receiving one-seventh (1/7) of the corpus and appellants John Charles Nickel and Nina Beverly Nickel sharing equally the one-seventh (1/7) of their deceased father John Beverly Nickel and thus each receiving one-fourteenth (1/14) of the corpus. The Bowles remaindermen, on the other hand, contend that the "stirpes" or family roots are to be found among the children of Nellie Miller Nickel, that the corpus should first be divided in two equal parts at the level of Nellie's children, George W. and Beatrice, one-half (½) thereof being distributed to the Nickel remaindermen and one-half (½) to the Bowles remaindermen. According to this contention, each of the Nickel remaindermen are entitled to *one-eighth* (⅛) of the corpus (one-fourth of one-half) except appellants John Charles Nickel and Nina Beverly Nickel who, sharing equally the one-eighth (⅛) share

listed, was stipulated to in the proceedings below by all parties to the present action.

of their deceased father, should each receive *one-sixteenth* (1/16), and each of the Bowles remaindermen are entitled to *one-sixth* (1/6) of the corpus (one-third of one-half).

On motions for judgment on the pleadings made in two consolidated actions,[5] the trial court upheld the contention of the Bowles remaindermen and rendered judgment accordingly. This appeal by the Nickel remaindermen followed.

■ At the outset, two cardinal precepts guide our examination of the central issue. First, since the court below based its construction of the Henry Miller trust solely on the terms of the trust instruments[6] without the aid of extrinsic evidence, under settled principles of appellate review we are not bound by the interpretation given by the trial court and we therefore proceed, as is our duty, to make the final determination in accordance with the applicable principles of law. (*Estate of Platt* (1942) 21 Cal.2d 343, 352 [131 P.2d 825]; *Meyer* v. *State Board of Equalization* (1954) 42 Cal.2d 376, 381 [267 P.2d 257].) ■ Secondly, in seeking the true construction of a trust instrument, *inter vivos* or testamentary as the case may be, we must if possible ascertain and effectuate the intention of the trustor or testator as expressed by the language of the instrument itself. (*Title Ins. & Trust Co.* v. *Duffill* (1923) 191 Cal. 629, 642 [218 P. 14]; *Ephraim* v. *Metropolitan Trust Co.* (1946) 28 Cal.2d 824, 834 [172 P.2d 501]; *Estate of Thompson* (1958) 50 Cal.2d 613, 617 [328 P.2d 1]; *Estate of Karkeet* (1961) 56 Cal.2d 277, 281 [14 Cal.Rptr. 664, 363 P.2d 896]; 2 Scott on Trusts (2d ed. 1956), § 164.1, p. 1156; Prob. Code, § 101.) Indeed the parties evince no disagreement with this basic canon of interpretation.

■ In short we must determine what Henry Miller meant by his direction that upon termination of the trust the corpus

---

[5]Both actions for declaratory relief were commenced in the court below on January 10, 1963: No. 528407 by Mary Nickel Lombardi, suing in her own behalf and in behalf of all Nickel remaindermen, against the three trustees of the Henry Miller trust (Marsden S. Blois, George W. Nickel, Jr., and Henry M. Bowles) and the three Bowles remainderman, and No. 528434 by the above three trustees against all Nickel and Bowles remaindermen. Each of the appellants and respondents herein were parties to both actions and filed answers to the respective complaints, complaints in intervention and cross-complaints. After the actions were consolidated, all parties before us filed motions for judgment on the pleadings.

[6]As stated *supra*, judgment below was on the pleadings which incorporated by reference attached exhibits of both the deed of trust and will. The parties stipulated to certain facts pertaining to the identities, relationship, dates of birth, marriage and death, and surviving issue of the descendants of Henry Miller. (See fn. 4, *ante*.)

was to pass to and vest in the descendants of Nellie and her husband per stirpes and not per capita. All of the parties stipulated in the court below that both the deed of trust and the will were prepared for Miller by a duly licensed California attorney. In the light of such circumstance, as this court has stated, "the presence of legal technical terms is an indication that the words are to be accepted in accordance with legal definition." (*Maud* v. *Catherwood* (1945) 67 Cal. App.2d 636, 641 [155 P.2d 111], citing our previous decision in *Estate of Thompson* (1937) 18 Cal.App.2d 680, 684 [64 P.2d 984]; see Prob. Code, § 106.)

█ The crucial phrases wrought in changeless Latin represent hardened legal concepts well known to every lawyer. Recognized legal dictionaries define "per stirpes" as meaning "By or according to stock or root; by right of representation" (Bouvier's Law Dictionary (Baldwin's Century Ed. 1940) p. 928) or "By roots or stocks; by representation" (Black's Law Dictionary (4th ed. 1951) p. 1294). On the other hand "When descendants take as individuals, and not by right of representation (*per stirpes*), they are said to take *per capita*" (Bouvier, *op. cit.*, p. 927), the phrase also being defined as "By the heads or polls; according to the number of individuals; share and share alike" (Black, *op. cit.*, p. 1292).[7] It is clear that the second phrase is the antithesis of the first. █ *Estate of Careaga* (1964) 61 Cal.2d 471, 476 [39 Cal.Rptr. 215, 393 P.2d 415] quoting *Maud* v. *Catherwood, supra,* 67 Cal.App.2d 636, 644 defines "per stirpes" or "by right of representation" as "taking the share of an immediate ancestor, who in turn takes the share of his next immediate ancestor and so on until a common ancestor is reached." (See also *Estate of Berk* (1961) 196 Cal.App.2d 278, 281 [16 Cal.Rptr. 492].)

█ Proceeding from these definitions it appears to us to be quite plain that Henry Miller intended the corpus of his trust to go to the descendants of his daughter and her husband by roots, stocks or families and not by heads, individually, or in equal shares. Literally, the descendants take

---

[7]Harpers' Latin Dictionary (American Book Company, 1907) gives the following, among other, definitions:
"stirps" (pl. stirpes) "The lower part of the trunk of plants, including the roots; a stock, stem, stalk; a root; . . . (of persons) a stem, stock, race, family, lineage; . . . (p. 1761).
"caput" (pl. capita) "The head, of men and animals . . . (in gen.) the head" (p. 289).
"per" is a Latin preposition meaning among other things "through" "by" or "by means of" . . . (p. 1332).

*through* or as *representatives* of their families. Since the
living descendants of Nellie and her husband emanate from
two roots or families, namely those of George and Beatrice
(see chart, fn. 4, *ante*), under such an interpretation the
Nickel remaindermen should take by right of representation
of their father, George, who, had he been able to take, would
have received one-half ($\frac{1}{2}$) of the corpus and similarly, the
Bowles remaindermen should take by right of representation
of their mother Beatrice, who, had she been able to take,
would also have been entitled to one-half ($\frac{1}{2}$) of the corpus.
Confirming this result is the emphatic mandate of the trustor
that such descendants must not take individually or in equal
shares.

Furthermore we are persuaded that this interpretation of
the Henry Miller trust grounded initially on the technical
language employed by the draftsman, finds support in Cali-
fornia precedents.

In *Estate of Healy* (1917) 176 Cal. 244 [168 P. 124] the
decedent James Healy by his will bequeathed " 'all other
personal property . . . unto the following grandnephews
and grandnieces by right of representation:

" 'Milly and Annie Lanning, . . . being the children of a
nephew whose name I do not now recall, but which said
nephew is a son of my sister Mary Healy;

" 'Nellie Lanning, . . . daughter of a nephew whose name
I do not now recall, but which said nephew is a son of my
sister Mary Healy. . . .

" 'William Burke . . . son of my nephew Patrick Burke,
which nephew is a son of my sister Bridget Healy.' " (P. 245.)

James Healy had two married sisters—Mary Healy Lanning
and Bridget Healy Burke. Milly and Annie Lanning were
the daughters of Joseph Lanning, one of Mary Lanning's
three sons. Nellie Lanning was the daughter of Henry Lan-
ning, also one of Mary Lanning's sons. William Burke was
the son of Patrick Burke, the only son of the decedent's other
sister, Bridget Burke.[8] The single question confronting the
court was the meaning of the testator's language "by right of
representation." On this issue, the respondents contended
that the intent of the testator as expressed in the above-quoted
clause of his will was to give one-third ($\frac{1}{3}$) of the residue to
Milly and Annie Lanning together, one-third ($\frac{1}{3}$) to Nellie
Lanning and one-third ($\frac{1}{3}$) to William Burke. This con-

[8]See chart on next page.

tention rested on the theory that the phrase "by right of representation" referred exclusively to the three nephews of the decedent and that its only effect was to limit the shares of Milly and Annie as representatives of their father Joseph (unnamed in the will) to one-sixth (1/6) each in lieu of shares of one-fourth (¼) each had the residue been left to the four persons named as a class without employment of the qualifying phrase. Appellants, on the other hand, contended that the phrase in question referred to the decedent's two sisters and that it required the residue to be divided initially in half.

The Supreme Court agreed with the appellants and reversed the decree of distribution which had adopted the theory of respondents. The court said: "We do not perceive any strong reasons for selecting the nephews as the stocks to which said introductory qualifying phrase refers, which do not point with equal or greater force to the selection of the sisters as the point of beginning of lineage intended. The phrase is in the introductory sentence of the fifth clause. By implication and grammatical construction it is to be taken as a qualification of all that follows, relating to the subject, to which the phrase would naturally apply. The natural meaning, therefore, would be that wherever the relationship of the legatees is such that the rule of descent by right of representation would apply, and nothing appears to indicate a contrary intent, the parties are to take 'by right of representation' and not *per capita*; or, in other words, that the principle of taking by representation should apply to the dispositions made, in all cases to which it could apply.

"Taking by right of representation occurs when the descendants of a deceased heir take together the same share of the estate of another person that their parents would have taken if living. (Civ. Code, § 1403.) We are to take the

[8]The following chart shows the pertinent family tree, the names of the legatees being underlined:

*Deceased.

testator as conceiving that his two deceased sisters should be the original stocks of descent, arbitrarily naming certain of their descendants to represent them as descendants in his testamentary scheme, and then declaring that the principle of representation should apply to the entire scheme. Giving the phrase this meaning and application, the result would be that the residue would first be divided into two parts, one for the persons named who were descendants of the sister Mary Healy Lanning, the other for those named who were descendants of the sister Bridget Healy Burke. This would give William Burke, as the sole representative of the testator's sister Bridget, one-half of the residue, and to the three descendants of the other sister Mary, the other half thereof.'' (176 Cal. at pp. 246-247.) Further applying the principle of representation, the court thereupon divided Mary's one-half ($\frac{1}{2}$) between Joseph and Henry, thereby allocating to each one-fourth ($\frac{1}{4}$). Finally, Joseph's two daughters, the named legatees Milly and Annie, were each adjudged entitled to one-eighth ($\frac{1}{8}$) of the residue as his representatives, and Nellie, as the sole named representative of Henry, to one-fourth ($\frac{1}{4}$).

In *Maud* v. *Catherwood, supra,* 67 Cal.App.2d 636, this court relied upon *Healy* in construing the *inter vivos* trust established by S. Clinton Hastings, first Chief Justice of the Supreme Court of California and founder of Hastings Law School, for the benefit of himself, his wife and their seven children. The trust instrument provided that the trust should terminate upon the death of the last survivor of the above beneficiaries whereupon the corpus should be distributed " 'to the then living lineal descendants of . . . [Judge Hastings] in fee, each of said descendants taking such parts or portions as they would respectively have been entitled to as heirs at law of the party of the first part had he himself been the last survivor of the said beneficiaries last above enumerated.' '' (P. 638.)

The trust terminated 68 years later upon the death of Judge Hastings' daughter Ella. Four of the trustor's seven children left issue, four of his nine grandchildren and two of his great-grandchildren survived Ella. (See fn. 9 below for family tree.) The question there to be determined was at what generation the corpus should be divided. Since the trustor had directed distribution to his lineal descendants in such

[9]See chart on next page.

portions as they would have received as his heirs-at-law had the trustor been the last survivor, the central question to be determined required the application of Probate Code sections 222 and 250.[10] Under the directions of the trust and the provisions of such statutes, the trial court divided the estate into four parts at the level of the trustor's four children leaving issue living at the time of the termination of the trust (Clara, Flora, Charles and Robert—see chart, fn. 9, below), and then determined the interest of each grandchild and great-grandchild by representation, allotting a share as indicated in the chart (see fn. 9). Appellants (all persons receiving an one-eighth ($1/8$) interest) contended that the corpus should have been divided at the level of the grandchildren and thus into six parts, the two great-grandchildren (Joseph and Jan) taking the shares of their parents by right of representation. Under this contention each grandchild and great-grandchild would have received the same amount, namely, one-sixth (1/6). This court rejected such contention, stating: "We may

[9]The following chart shows the pertinent family tree, the names of the six survivors being underlined, all other persons being deceased:

S. Clinton and Azalea Hastings

[10]Prob. Code, § 222, provides: "If the decedent leaves no surviving spouse, but leaves issue, the whole estate goes to such issue; and if all of the descendants are in the same degree of kindred to the decedent they share equally, otherwise they take by right of representation."

Prob. Code, § 250, provides: "Inheritance or succession 'by right of representation' takes place when the descendants of a deceased person take the same share or right in the estate of another that such deceased person would have taken as an heir if living. A posthumous child is considered as living at the death of the parent."

accept the language of section 222 as directing that the estate be shared per capita if all of the descendants are of equal degree of kindred and we may not question the wisdom of the Legislature in so providing, but likewise we must bow to legislative direction when we are told that if the descendants are not of equal degree of kindred 'they take by right of representation.' To take per capita all must be in the class or degree of next of kin. (Am.Jur.Cum.Supp. to vol. 16 (Descent and Distribution), § 42.) 'Succession to estates is purely a matter of statutory regulation, which cannot be changed by courts.' *(Estate of Ingram,* 78 Cal. 586 [21 P. 435, 12 Am.St.Rep. 80].)'' (67 Cal.App.2d at p. 643.)

In *Kidwell* v. *Ketler* (1905) 146 Cal. 12 [79 P. 514], the testator established a trust with the income payable in equal shares to his niece, Katie Ketler, and his nephew, Willie Ketler, for life, or if either died without issue then to the other for life, but if either died leaving issue, one-half (½) of the income was to be expended for the maintenance and education of such issue until the death of both Katie and Willie. Upon such last event the corpus *"shall become the absolute property of the issue of the said Katie and Willie then surviving;* . . .'' (P. 16.) Katie died in 1871 leaving one child; Willie died in 1901 leaving five children. The court upheld distribution on a stirpital basis pursuant to which Katie's child received one-half (½) and Willie's children shared equally the remaining half, each of them receiving one-tenth (1/10) of the corpus.

It is notable that in each of the above three cases the court determined the distributable shares in the corpus by reverting to the family roots or stocks, whether the kindred involved were lineal *(Maud* v. *Catherwood, supra)* or collateral *(Estate of Healy* and *Kidwell* v. *Ketler, supra)*. In each the apportionment was effectuated by successively taking the shares of immediate ancestors *(Estate of Careaga, supra,* 61 Cal. 2d 471, 476) until the ultimate family roots or stocks were reached. In *Healy* these roots were at the level of the sisters (see fn. 8, *ante*); in *Kidwell,* they were the niece and nephew; in *Maud,* they were at the level of the trustor's children (see fn. 9, *ante*). The reasoning of all of these cases is consistent with the concept inherent in the phrase ''per stirpes'' or ''by right of representation.'' ▮ We think that it is implicit in this technical phrase of the law, as well as clear from the foregoing precedents, that in a stirpital distribution, the family roots or stocks are among the ancestors of those who are to

take the estate, despite the fact that the ancestors themselves do not take. We therefore reject appellants' contention that where there is a gift per stirpes the family roots or stocks are to be found among the first takers or, as appellants Nickel and Lombardi frame the argument that "the first generation of takers having a living member at the date the stirpital gift is distributed is the generation whose members comprise the stirpes." None of the appellants have cited either in their extensive briefs or at oral argument, nor have we found, any California case supportive of such a proposition.

We are not persuaded that the foregoing California cases are valueless or inapposite because of certain claimed distinguishing factors pointed out by appellants. It is urged that in *Healy* the interpretation of the court is supportable on the position in the dispositive clause of the crucial phrase "by right of representation." While, as the court there stated, the phrase by its position in the introductory portion of the clause had a qualifying effect on all that followed, it does not appear that this position was a matter of necessity or that the result would have been different if the phrase had been placed, as in the instant case, after the designation of the beneficiaries. We think that this is just a matter of good sense in construing the words used by the testator or trustor. If one can reasonably conclude from the dispositive clause as a whole that a stirpital division was intended, it should make no difference where the draftsman has placed the term of art to express such intent. It is also urged that the ultimate takers in *Healy* were described "with infinite precision" through their family lines, using names and spelling out relationships. This, we think, is but an incidental circumstance. As respondents point out to us, the testator in *Healy* knew who the ultimate takers were, while in the instant case the trustor Henry Miller had no way of identifying except by general description those persons who were to take the corpus conceivably years later. Finally, appellants Nina and John Charles Nickel argue that since in *Healy* all possible takers were named as well as limited to the same generation (i.e., all were grandnephews and grandnieces) the family roots or stocks had to be found among the ancestors rather than among the first takers. In other words, so the argument goes, the crucial phrase "by right of representation" was there applied to lines descending *to* the takers because it was impossible to apply it to lines descending *from* the takers. Our reading of the opinion fails to disclose any insinuation of such a rationale. It is manifest from those portions of the opinion quoted by

us above that the court used the term ''by right of representation'' in the sense of the various definitions set forth by us above. Nowhere is it indicated that this long settled connotation was adopted by the court and applied in identifying family roots among the ancestors only because such roots could not first be found among the takers. Appellants' argument smacks of wishful speculation. As we have said, they cite no California authority in support of it.

Appellants' attack against the *Maud* case is multifold but in essence a charge that the case was improperly decided.[11] We are not now called upon to justify the opinion. It should be noted however that, as set forth above, the trust in *Maud* did not provide for the distribution of corpus ''per stirpes,'' or ''per stirpes and not per capita'' (as here) or ''by right of representation'' (as in *Healy*). In *Maud* distribution was directed to be made to the trustor's ''living lineal descendants'' who would have been his heirs-at-law had he been the last survivor of the life beneficiaries. Thus an artificial class of heirs was designated (see *Estate of Miner* (1963) 214 Cal. App.2d 533, 541 [29 Cal.Rptr. 601]), whom the court was required to ascertain pursuant to the applicable statutes of succession. It was therefore necessary for the court to apply and interpret Probate Code sections 222 and 250. Determining that such descendants were not all in the same degree of kindred to the trustor (or decedent) and concluding that *all* descendants must therefore take by right of representation, the court went back to the family roots or stocks and reached the result we have already explained. (See fn. 9, *ante*.)

The significance of *Maud*, however, in the present case lies

---

[11]Appellants argue: that *Maud* overturned established principles of stirpital succession and ignored an accepted interpretation of identical statutes in other jurisdictions; that the case has been severely criticized and rarely cited; that in a variety of factual situations it leads to bizarre results; and that essentially it is not in point. One of the illustrations of bizarre results presented by appellants Nina and John Charles Nickel hypothesizes a situation where a decedent leaves five grandchildren, one the son of a deceased son and four the children of a deceased daughter. Under Prob. Code, § 222, as construed in *Maud*, it is pointed out that all grandchildren being in the same degree of kindred to the decedent, each would receive one-fifth (1/5), while if the grandson who was the sole child of the deceased son, were also deceased leaving two great-grandsons, all descendants therefore *not* being in the same degree of kindred, each of the four grandchildren would receive *one-eighth* (⅛) (one-fourth (¼) of one-half (½)) but the two *great*-grandchildren would each receive one-fourth (¼) (sharing equally in their parent's one-half (½)), or *twice* as much as each grandchild despite the fact that they stood in a more remote degree. Appellants refer to the Model Probate Code where results of this kind are averted by providing that only the issue of more remote degrees take by representation.

not in this aspect of intestate succession and we may therefore put to one side respondents' argument that if the Nickel and Bowles remaindermen were to take under the statutes of succession they would receive the same shares as they have been awarded in the trial court. We think that the decision of this court in *Maud* has precedential value in the case at bench because in a stirpital distribution it gave meaning to the notion of going back among ancestors to determine family roots. This was the concept articulated by the Supreme Court in *Healy* upon which *Maud* relied. It is notable that the Supreme Court in turn followed *Maud* in its recent opinion in *Estate of Careaga, supra,* 61 Cal.2d 471, 476, in imparting to the terms ''per stirpes'' or ''by right of representation'' the connotation of going back successively among ancestors.

Appellants attack *Kidwell* v. *Ketler, supra,* principally on its applicability to the question of determining the distribution of corpus from the distribution of income, a matter we discuss *infra*. But the case presents respectable credentials on the broad issue here under discussion and it is to be noted that some of the appellants concede that in the light of its facts, the decision reached in *Kidwell* was a logical one. Aside from the relationship between income and corpus, *Kidwell* in broad effect shows that a stirpital division involves going back among ancestors to determine the family roots or stocks.

We conclude therefore that from the definitions of the technical terms involved and from the California cases discussed above, a rule emerges, namely, that where a division or distribution is directed ''per stirpes'' or ''by right of representation'' absent any language indicating a contrary intent, the family roots or stocks are to be found among the ancestors of those persons who are to take the property or estate rather than among the takers themselves, irrespective of whether or not such ancestors were ever entitled to take. (See *Ballenger* v. *McMillan, infra,* 205 Md. 94 [106 A.2d 109]; *Sidey* v. *Perpetual Trustees Estate & Agency Co. of New Zealand, Ld., infra,* A.C. 194.)

In the instant case we think the trustor Henry Miller has expressed in clear and plain language his intention to distribute the corpus of the trust according to family roots or stocks. Applying the above rule to the facts of the case we believe that the two family roots are those headed by George W. Nickel and Beatrice Nickel Bowles Morse, the only two children of Nellie Miller Nickel with lineage surviving and

that the corpus divided in half at the level of such children, should be distributed among their surviving issue on a representational basis. In our view, the learned trial judge properly so construed the trust instrument and correctly divided the corpus among the remaindermen on this basis.

We therefore disagree with the contention of appellants George Nickel, Jr., and Mary Lombardi that the gift of the corpus while per stirpes was of a "basic substitutional nature," that the children of Nellie were not intended to be the "stirpes" because they were barred from participating in the corpus, and that the gift of the corpus was made directly to the descendants as first takers "who take by representation of no one." It is argued that the term "per stirpes" was intended only in its substitutional sense. The definitions of the term and the foregoing California cases leave no doubt in our minds that per stirpes means that those receiving the gift take it by or through their family roots or stocks but that this does not necessarily import that the gift is substitutional in nature. It is clear to us that the term was not intended to have a substitutional connotation in the trust at hand. Indeed, as counsel for respondent Henry Bowles note in their brief and emphasized at oral argument, in other parts of the trust, the phrase "by right of representation" is employed in connection with direct gifts over without any possibility of such gifts being substitutional in nature.[12] In each case the takers of the gift received it by right of representation, i.e., by or according to their family roots, but nevertheless in each case the parents of the takers were themselves never entitled to take. Contrary to appellants' thesis, there was no basic substitutional nature in the gift. Nor, contrary to appellants' claim, does the fact that the trustor used words

[12]In paragraph 2(c) of Part II of the deed of trust the trustees are directed to "pay to Sarah Long Brown, niece of the party of the first part, the sum of Twenty thousand dollars ($20,000), to be held and enjoyed by her during her life, and the balance remaining at her death the takers of the gift received it by right of representation, shall go the [sic] children of *her sisters and brothers by right of representation.*" (Italics added.)

In paragraph 3 of Part II of the same instrument it is provided that upon the deaths of Nellie Miller Nickel and J. Leroy Nickel without surviving descendants, one-quarter (¼) of the corpus shall pass "to the descendants of the sisters of said party of the first part [i.e., Henry Miller] by right of representation, absolutely and free of all trusts, . . ."

In Article Second of the will it is provided that certain real property located in Santa Clara County, upon the death of Nellie Miller Nickel, leaving neither children nor descendants of children, "shall vest in the descendants of my sisters by right of representation."

of present conveyance in directing distribution of the corpus override the effect of his use of language directing a stirpital division.

That the distribution of the corpus here given our approval results in shares of different amounts is a natural consequence of a division per stirpes and is, we think, beside the point. Division by right of representation rests on no basis of equality (see *Maud* v. *Catherwood, supra,* 67 Cal.App. 2d 636, 646-648). We are not persuaded therefore by appellants' arguments to the effect that the trustor intended equal treatment of the beneficiaries. As we stated at the outset, appellants urge that the corpus be divided in seven equal shares at the level of the grandchildren. We observe a curious inconsistency in appellants' position. While they invoke a principle of equality in the distribution of the corpus, they refrain from applying it to appellants Nina and John Charles Nickel and from thus urging a division in *nine* equal shares. Under appellants' theory these two remaindermen should receive their father's (one-seventh (1/7)) share. Actually appellants seek a distribution *per capita* and not per stirpes. The trustor explicitly stated that distribution should *not* be per capita. Nowhere did he employ words of equality in reference to this division. On the contrary he clearly stated that it was to be "per stirpes and *not* per capita" (italics added)—i.e., *not* in equal shares. If the division results in unequal shares, such was the trustor's intent. For the same reason there is no merit to appellants' argument that since the primary concern of Henry Miller was "to prolong the cohesion of his estate in its corporate form as long as possible," there is no basis for concluding that he intended to favor some unknown descendants over others. It is implicit in his direction of a stirpital division that he desired a division by families even though the shares of all takers might not be equal.

Appellants Nina and John Charles Nickel argue that from a comparison of the critical clause at hand with a number of other provisions in both the deed of trust and will it is clear that the phrase "per stirpes" refers only to lineage *descending.* The nucleus of this argument is that the draftsman deliberately used the phrase "by right of representation" only in reference to lineage *ascending* and had he wanted the takers of the corpus to receive shares according to their family roots, he would have used the phrase "by right of representation." This "shift of language," appellants say, is a telling mark of a different intention. We do not agree. "Per stirpes" and "by right of representation" mean the same

thing (*Estate of Careaga, supra,* 61 Cal.2d 471; *Maud* v. *Catherwood, supra,* 67 Cal.App.2d 636; *Estate of Berk, supra,* 196 Cal.App.2d 278; Bouvier's Law Dictionary, *op. cit.*; Black's Law Dictionary, *op. cit.*). Our examination of the instruments which we need not detail reveals that the draftsman also used "per stirpes" in reference to lineage ascending (e.g., in connection with the income provisions, discussed *infra*) and convinces us that in the provisions dealing with the corpus, contrary to appellants' claim, there is neither shift in language nor difference in the connotation of the technical words employed. As the above authorities make clear, we think "per stirpes" and "by right of representation" as used in the instruments have the same meaning. We think Henry Miller's draftsman was of the same opinion.

 Nor do we perceive in the so-called "true intent" clause of the instruments any overriding influence derogating from the clear and precise words of the clause under examination.[13] While admittedly the "true intent" clause discloses a difference in language, we think that the clause under analysis is the dispositive clause for the corpus and prevails.

 Another facet of the Henry Miller trust gives strong support to the conclusions we have reached. The provisions of the trust dealing with the payment of income, set forth by us at the beginning of this opinion, directed in substance that after the deaths of Nellie and her husband, the income was to be paid equally to their children and to the issue of any deceased child per stirpes and if a child died without issue, the share of such child should go to the other children and the issue of any deceased child "per stirpes and not per capita."

---

[13]The so-called "true intent" clause in pertinent part provides: "The true intent and meaning of this provision being that said trust so far as it is for the benefit of said Nellie Miller Nickel and J. Leroy Nickel and their descendants shall absolutely cease and terminate upon the death of said Nellie Miller Nickel and J. Leroy Nickel, and of their children living at the time of the death of said party of the first part, and that thereupon the said Medical Research Fund and said Las Animas Hospital Fund, and upon the death of said Nellie Miller Nickel and said J. Leroy Nickel said San Francisco Charities Fund, shall be by said trustees held solely on the trusts set forth in the next paragraph of this deed, and that the remainder of said property shall vest in the descendants of said children, absolutely and free of all trusts, . . ." It is to be noted that the foregoing clause provides that the remainder of the property shall vest in the descendants *of the children* of Nellie and J. Leroy Nickel living at the trustor's death instead of the descendants of Nellie and J. Leroy and that the terms "per stirpes," "per stirpes and not per capita" and "by right of representation" are not found therein.

In *Kidwell* v. *Ketler, supra,* 146 Cal. 12, which we have already discussed, the court considered the relationship between provisions for income payments to a niece and nephew for life, or if either died to his or her issue and provisions for the distribution of corpus on the death of *both* persons to "the issue of said Katie and Willie then surviving." The court there said: "Construing this trust with a view thus to arrive at the intent of the testator, it is at least apparent that in the disposition of the income to arise from the trust property he contemplated a distribution *per stirpes*. When the younger of the two attained majority any surplus proceeds of the investments was to be divided between them equally, and thereafter all the net proceeds were to be divided between them equally. In the event of one dying with issue, it was the share of the proceeds which had been paid to the parent, and that share only, which was to be given to the children, and thus come to the final clause requiring construction —the disposition to be made in the event that actually arose— when both have died, both leaving children. It would seem to be reasonably certain that as the trustor contemplated a disposition of the proceeds of the trust between the two as separate families, so he contemplated the division of the *corpus* of the trust in like manner, *per stirpes,* and it follows that the court correctly construed the trust in this regard." (Pp. 19-20.)

In *Maud* v. *Catherwood, supra,* 67 Cal.App.2d 636, 642, this court said: "That Judge Hastings had no intention that his grandchildren should take per capita during the operation of the trust is illustrated by the provision in the instrument that if a child, entitled to a part of the net income 'shall have prior deceased and have left issue yet alive, then such issue to take by right of representation, such share as would have gone to such deceased child had it been then alive.' The indenture further provided '. . . and in the event that such issue shall become extinct prior to the decease of the last survivor of all the said children above enumerated, then the shares of such issue to those of the said children surviving such issue, for and during their respective lives with rights of representation to any issue of any other and prior deceased of the said children until the death of the last survivor of the said children above enumerated.' That clause indicates that the grandchildren should receive by right of representation and not per capita during the operation of the trust. *Why there should be a change at the time of distribution*

*from the disposition which prevailed during the operation of the trust, has not been satisfactorily answered by appellants.''* (Italics added.)

In the case before us, it is manifest that Henry Miller intended to have the trust income paid equally to the children of his daughter Nellie. But it is also clear that he did not intend such equality of treatment for subsequent generations. Issue of any deceased child of Nellie's were not to receive the income in equal shares with Nellie's children but were to receive only the share of their deceased parent. By express stipulation, generations subsequent to Nellie's children took per stirpes. Thus, the descendants of Nellie were arrayed in family lines to receive payment of income, each line headed by one of Nellie's children. These lines formed the family roots or stocks on which we resolve our problem. It is of the highest significance here that, as already detailed, the income was paid on a stirpital or family basis throughout the entire life of the trust.[14] We are persuaded that this disposition of income per stirpes or on a family basis is cogent evidence of the trustor's intent and, that paraphrasing *Kidwell*, as the trustor clearly directed a disposition of the income per stirpes, so he contemplated a division of the corpus in like manner.

Appellants attempt to distinguish *Kidwell* from the case before us. While conceding that the result reached in that case was logical and just, they argue that it was impelled by the integrated character of the relevant trust provisions and the "singularity" of the trust instrument. Appellants George Nickel, Jr., and Mary Lombardi also emphasize a difference in language in the instant trust between the income-disposing provisions and the corpus-disposing provisions.[15] We apprehend no distinction of substance in these particulars. Obviously the important consideration is the substance or

---

[14]It will be recalled that after the deaths of both Nellie Miller Nickel and her husband, the income was divided equally among their three surviving children, George, J. Leroy, Jr., and Beatrice. (Their fourth child Henry predeceased the trustor.) Upon J. Leroy, Jr.'s death in 1959 without issue, the income was divided equally between George and Beatrice. Upon George's death in 1962, Beatrice continued to receive one-half ($\frac{1}{2}$) of the income and the other half (George's share) was paid to the issue of George—Sally, George, Jr., and Mary, each taking one-eighth ($\frac{1}{8}$) (i.e., one-fourth ($\frac{1}{4}$) of their parent's onehalf ($\frac{1}{2}$)) and the remaining one-eighth ($\frac{1}{8}$) which would have gone to John Beverly being paid in equal shares to the latter's children, John and Nina, each of whom received one-sixteenth (1/16).

[15]In substance they point out that the income is payable to the *children* of Nellie and the issue of any deceased child per stirpes while the corpus passes to the *descendants* of Nellie and her husband per stirpes.

effect of the provisions involved rather than the identity of the language employed. In the trust instrument before us the provisions for the disposition of both income and corpus are found in the same division of the trust (subdivision 3 of division II), are reasonably juxtaposed and, under textual examination, appear in natural sequence. The use of a technical legal term (per stirpes) in respect to the disposition of income and the same term even more emphatically expressed with an exclusion of its antithesis (per stirpes and not per capita) in respect to the disposition of corpus imparts a precision and clarity to the directions.[16] In each instance, the distribution is ordered on a family basis where generations subsequent to Nellie's children are involved. We wish to make clear that we propose no rigid formula establishing in every instance a necessary identity of treatment in disposing income and corpus. But we are satisfied that the same treatment was intended in the instant case. ▇ Highly significant here is the technical phrase of the law utilized by the draftsman. To shut our eyes to the precision which it brings to the trust instrument is to withhold full credit from the learning, thought and skill which the trained lawyer brings to his handiwork.

In support of their basic contention that the first generation of takers constitute the ''stirpes'' or family roots, appellants cite a number of authorities from other American jurisdictions and from England. We think that they lack persuasive force and we therefore decline to follow them. We proceed to examine some of these cases upon which appellants rely heavily. No useful purpose would be served by discussing all of the cases or even by subjecting all selected to a detailed analysis where it is apparent that they follow the same line of authority.

Generally speaking appellants seek support for their position in a line of cases headed by the English case of *Robinson* v. *Shepherd* [1863] 4 De G.J. & S. 129, 46 Eng.Rep. 865. There the testator directed that certain property be sold and the proceeds distributed ''in equal shares among and to the lawful descendants living at the time of my death of such of the brothers and sisters of my late grandfather . . . as have died leaving lawful descendants; such descendants re-

---

[16]It is to be noted that the terms ''per stirpes,'' ''per stirpes and not per capita,'' or ''by right of representation'' are nowhere to be found among the relevant trust provisions in *Kidwell*. In this respect the *Kidwell* provisions appear less exact than those in the instant case.

spectively to be entitled to share the same moneys in a course of distribution *per stirpes* and not *per capita*.'' Two sisters predeceased the testator leaving lawful descendants. The Master of the Rolls held that the fund was first divisible into two parts, one part belonging to the descendents of one sister per capita and the other to those of the other sister per capita. On appeal the Lord Chancellor reversed stating: ''The Master of the Rolls has applied the words *'per stirpes'* as denoting the sisters of the testator's grandfather, from whom the present claimants originally take. But the will does not direct a division of the sale moneys in question into as many families as there might be brothers and sisters of his grandfather who had died leaving issue; but a division amongst the descendants themselves as purchasers, as simple legatees—such descendants, however, being arranged *inter se* according to the principle of families, and not according to the principle of individuals. And, in my judgment, as I have said, the words *'per stirpes'* refer to the descendants; the expression then giving the rule of selection according to the principle of the stocks to be found amongst those descendants.'' (4 De G.J. & S. at p. 131; 46 Eng.Rep. at p. 866.)

While the Master of the Rolls adhered to his original rationale in a subsequent case, *Gibson* v. *Fisher* [1867] L.R. 5 Eq. Cas. 51, the rule announced in *Robinson* by the Lord Chancellor that the stirpes or stocks were to be found in the first generation of takers among the descendants of a named person or persons was followed in later English cases (*In re Wilson* [1883] 24 Ch.Div. 664; *In re Dering* [1911] 105 L.T.R. 404, and *In re Alexander* [1918] 1 Ch.Div. 371) and in America in *Patchell* v. *Groom* (1945) 185 Md. 10 [43 A.2d 32], all of which appellants cite.[17]

However, as respondents point out to us, the rule announced in *Robinson* v. *Shepherd* and applied in subsequent cases, appears to have been repudiated in England in *Sidey* v. *Perpetual Trustees Estate & Agency Co. of New Zealand, Ld.* [1944] A.C. 194. In that case the testator was survived by four children one of whom died without issue. His will provided that ''from and after the death of the last survivor of my said four children as aforesaid I give devise and bequeath

---

[17]For example in *Wilson* the court said: ''The question is, where am I to look for 'the stocks?' The legatees under the will are the persons whose shares are to be distributed in this way, and this appears to me to indicate an intention that the legatees themselves are to be looked to as the origins of the stocks rather than any other persons outside them.'' (24 Ch. Div. at p. 667.)

the whole of my residuary estate real and personal to and amongst my then surviving descendants in such manner that the same shall be divisible per stirpes among the children grandchildren and remoter issue of such of my children as shall have left issue.'' (P. 196.) The Court of Appeal of New Zealand declined to divide the estate in thirds at the level of the testator's children and ordered a distribution in ninths at the level of the testator's grandchildren, each of eight surviving grandchildren receiving one-ninth (1/9) of the estate and a great-grandchild receiving the remaining ninth as a representative of his parent. The Judicial Committee of the Privy Council taking the position that no rule of construction required a stirpital division to begin at one generation rather than another and that the result in each case must depend on the language used, reversed the order of distribution, holding that the testator's children formed the stocks of descent and that a division should be made in three equal parts, each part being distributed to the grandchildren and one great-grandchild on a representational basis.[18] It is important to note however that the Privy Council reviewing the rule applied in *Robinson* v. *Shepherd* and subsequent cases, and now relied upon by appellants herein, made the following observation: ''Their Lordships do not think it necessary to question the correctness of any of the decisions to which reference has been made, but they cannot elevate the reasoning which led to such decisions into a rule of construction. There appears to them on principle to be no reason why, in the construction of a gift per stirpes the stocks should be found among the takers and not among their ancestors. In the simplest case, where a gift is made to a number of persons of different stocks, but of the same generation per stirpes and not per capita, it is manifest that the stocks are to be found, not in the takers, but in the ancestors, and this result is reached, not by the displacement of any prima facie rule of construction, but by the consideration of the language of the gift without any predilection. The language of the will under appeal is to be approached in the same way.'' (A.C. at pp. 202-203.) We think that in the light of the facts of the case at bench, *Sidey* supports the position of respondents.

---

[18]Thus one-third (⅓) was distributed to the sole child of one of the testator's deceased sons; one-third (⅓) in equal shares to four children of another deceased son; and the remaining third in equal shares to three children of the testator's deceased daughter and the sole child of a fourth deceased child of such daughter.

A further weakening of the line of authorities relied upon by appellants is indicated by the decision in *Ballenger* v. *McMillan* (1954) 205 Md. 94 [106 A.2d 109]. There the Maryland Court of Appeals which had applied the rule of *Robinson* v. *Shepherd* in the previous case of *Patchell* v. *Groom, supra,* 185 Md. 10 [43 A.2d 32], followed the *Sidey* case[19] and held that where an *inter vivos* trust provided that the income should be paid to the trustor's children for life and that upon the death of the last surviving child the corpus "shall go to all the descendants of the . . . [trustor] then living, to be divided among them per stirpes and not per capita," the stocks were to be found among the ancestors of the takers (i.e., the trustor's children) rather than among the takers themselves.

Quite apart from the above instances where the rule relied upon by appellants has been repudiated, is the compelling circumstance that it was never at any time given recognition in California. As we have observed on at least two occasions above, appellants have referred us to no California authorities even remotely indicating a sympathy for, if not espousal of, the rule urged by them and upon our inquiry at oral argument offered no authority even intimating the acceptance of such rule in this state. We have discussed the California cases supportive of a rule unfavorable to appellants. It is worthy of note that in one of these, *Estate of Healy, supra,* 176 Cal. 244, 247-248, the losing parties, like appellants here, had relied upon *Robinson* v. *Shepherd, supra,* 4 De G.J. & S. 129, 46 Eng.Rep. 865 and cases following it. The court in *Healy* however declined to follow such cases and stated that *Gibson* v. *Fisher, supra,* L.R. 5 Eq.Cas. 51 and *Siders* v. *Siders* (1897) 169 Mass. 523 [48 N.E. 277], "are more nearly like the case at bar, and are to that extent precedents in favor of our conclusion." (176 Cal.at p. 248.) It will be recalled that *Gibson* was the case where the same Master of the Rolls, despite his being reversed by the Chancellor in *Robinson* continued to apply the rule that family stocks are to be found among the ancestors.[20]

---

[19]The *Sidey* case though decided July 5, 1944, and therefore before *Patchell* (decided June 13, 1945) received no mention in the latter opinion.

[20]In *Gibson* the will read: "And pay all the rest, residue, and remainder of the moneys equally amongst the descendants of the brothers and sisters . . . of my . . . father, . . . who may be living at the time of my decease; such descendants . . . to take severally as tenants in common, *per stirpes,* and not *per capita.*" Lord Romilly, the Master of the Rolls, held: "I am of opinion that the whole residue must be divided

Nor are we impressed by appellants' reference to certain New York cases and to the Restatement of Property. None of the cases (*In re Duval's Estate* (1932) 145 Misc. 792 [261 N.Y.S. 884]; *In re Ives' Estate* (1936) 161 Misc. 60 [291 N.Y.S. 981]; *In re Pulitzer's Estate* (1958) 14 Misc. 734 [179 N.Y.S.2d 108]) involve provisions similar to those in the instant case. As to the Restatement, appellants George Nickel, Jr., and Mary Lombardi rely on a portion of comment *h* of section 301[21] as declarative of the "established and accepted rule" which they claim is applicable. Section 301, as its title indicates, deals with the distribution of property to classes described as "B and his children," "B and the children of C," "children of B and children of C" or by other words of similar import and is not applicable to the trust provisions at hand. Moreover, comment *h* of section 301 quoted by appellants does not express the law in California as the California Annotations to the Restatement disclose. (See 1950 annotations to vol. 3, Rest., Property, Pocket Supp. p. 55 citing *Maud* v. *Catherwood, supra,* 67 Cal.App.2d 636 as *contra* to the last sentence of the portion of comment *h* relied upon by appellants and set forth in fn. 21, *ante.*) We think, therefore, that appellants' reliance on section 301 is misplaced. Were it necessary to supplement or reinforce our conclusions herein with constructional rules of the Restatement of Property we would probably conclude that section 303, not section 301, was applicable. Under section 303[22] which is entitled "Dis-

---

*per stirpes* from the beginning, and that the rule of the *stirpes* must run through every descent, considering that '*per stirpes*' is an expression which means that all the persons who are to take are to take *per stirpes,* and that this must run through the whole range of the descents.'' (P. 58.)

[21]Said appellants quote the following portion: ''When a stirpital distribution is directed it is necessary to determine who are the heads of the respective stirpes. Normally these are easily inferred from the terms of the limitation, as for example, in a limitation 'to the children of B and of C per stirpes,' in which case the designated first takers, 'children of B and of C,' are the heads of the respective stirpes (see Illustration 1). In cases where no such inference can be drawn from the terms of the limitation the heads of the respective stirpes are the 'possible takers' who are of the oldest generation in which there is at least one living member at the time when distribution is to be made.''

[22]Section 303 of the Rest., Property in pertinent part states: '' (1) When a conveyance creates a class gift by a limitation in favor of a group described as the 'issue of B,' or as the 'descendants of B,' and the membership in such class has been ascertained in accordance with the rules stated in §§ 292 and 294-299, then, unless a contrary intent of the conveyor is found from additional language or circumstances, distribution is made to such members of the class as would take, and in such shares as they would receive, under the applicable law of intestate

tribution—Class Described as 'Issue of B,' or as 'Descendants of B,' or as 'Family of B,' '' distribution would be made under applicable California statutes of intestate succession, and thus as respondents indeed point out to us, under the previous holding of this court in *Maud* v. *Catherwood, supra,* 67 Cal.App.2d 636, the same result would be reached as was reached by the trial court.

In sum we are not convinced that appellants' line of authorities should be accepted in disposing of the controversy at hand.

The saga comes to an end. The lawyer's skillful language, which for two generations made secure the fortune of Henry Miller, now unlocks its riches for division according to the two surviving families of the founder. This, we are satisfied, is what Henry Miller intended to accomplish.

The judgment is affirmed.

Molinari, J., and Bray, J.,* concurred.

A petition for a rehearing was denied November 16, 1964, and appellants' petition for a hearing by the Supreme Court was denied January 13, 1965.

---

succession if B had died intestate on the date of the final ascertainment of the membership in the class, owning the subject matter of the class gift.''

Comment *f* under § 303 in pertinent part states: ''When a limitation is made to the 'issue of B,' or to the 'descendants of B,' and all of B's children are dead, but grandchildren of B are alive, a problem arises as to whether these grandchildren of B take equal shares or take as representatives of their respective parents. This is determined in any state in the same manner as the similar problem of intestate succession is determined in that same state. . . .''

Comment *h* under § 303 in pertinent part states: ''Limitations which come within the rule stated in this Section frequently contain language or have circumstances tending to corroborate the conclusions that the term 'issue' or 'descendants' has been used as substantially the equivalent of 'heirs of the body' and hence that distribution should be made in accordance with the law of intestate succession. Such corroborative factors are of particular importance when the limitation also contains one or more other factors tending to establish the 'contrary intent of the conveyor' referred to in Subsection (1). Illustrative of these corroborative factors are the following: (1) the conveyance specifically provides for a per stirpes distribution; . . .''

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.