128 P.3d 815

**In the Matter of the ESTATE OF Samuel M. DAMON, Deceased.**

**Trust Created Under the Will of Samuel M. Damon, Deceased.**

No. 25216.

Supreme Court of Hawai'i.

Feb. 16, 2006.

As Amended Feb. 28, 2006.

Reconsideration Denied March 9, 2006.

Carroll S. Taylor, Kimo C. Leong, and Gregory W.K. Chee (of Taylor, Leong & Chee), on the briefs, Honolulu, for petitioner-appellant Michael E. Haig.

A. James Wriston, Jr., Ronda K. Kent, and Aaron M. Shumway (of Ashford & Wriston), on the briefs, Honolulu, for respondents-appellants Joan Haig and Wendy Haig.

John L. McDermott, on the briefs, Honolulu, for respondent-appellant Christopher Damon Haig.

Daniel H. Case, Steven L. Rinesmith, Frank T. Kanemitsu, and Cathy L. Takase (of Case Bigelow & Lombardi), Honolulu, and Robert E. Rowland (of Mancini, Rowland & Welch), on the briefs, for respondents-appellants Harriet D. Baldwin, Peter D. Baldwin, Bennet M. Baldwin, Katherine B. Achaval, Frances D. Holt, Daniel F. Holt, Allison H. Gendreau, and Melanie F.H. Bostock.

James H. Wright, on the briefs, Honolulu, for respondents-appellants Brendan Damon Mesker and John P. Damon.

Anthony S. Chan and Shawn B. Thompson (of Thompson & Chan), on the briefs, Honolulu, for respondents-appellees Heidi Ann Snow, Julia Ann Snow, and Frank Edward Snow.

Warren Price, III, Sharon R. Himeno, Robert A. Marks, and Robert M. Kohn (of Price Okamoto Himeno & Lum), Honolulu, William H. Soskin, pro hac vice, and Scott N. Carter, pro hac vice, on the briefs, for respondents-appellees Sharon Damon, Siddhartha Damon, and Shawnna Sorenson.

Mervyn S. Gerson, Alan J. Ma, Bruce D. Hieneman, and Kristie K. Cruz Chang (of Gerson & Hieneman), on the briefs, Honolulu, for respondents-appellees Samuel E. Damon, Samuel Renny Damon, Pia Damon Spee, Julio Damon Spee, Miles Samuel Spee, and Philip Edward Spee.

J. Thomas Van Winkle, Katherine G. Leonard, and Eric S.T. Young (of Carlsmith Ball), on the briefs, Honolulu, for trustees/respondents-appellees David M. Haig, Fred C. Weyand, Paul Mullin Ganley, and Walter A. Dods, Jr.

MOON, C.J., LEVINSON, NAKAYAMA, and ACOBA, JJ.; Circuit Judge WILSON, in place of DUFFY, J., Recused.

Opinion of the Court by MOON, C.J.

The instant case involves the interpretation of a corpus distribution provision in a trust (the trust) created under the last will and testament of Samuel Mills Damon. Petitioner-appellant Michael E. Haig (M. Haig) and four groups of respondents-appellants [hereinafter, collectively, Appellants], specifically identified *infra*, appeal from the June 21, 2002 amended judgment of the Circuit Court of the First Circuit, the Honorable Colleen K. Hirai presiding, entered pursuant to Hawai'i Probate Rules (HPR) Rule 34 (2003) [1] and Hawai'i Rules of Civil Procedure

---

1. HPR Rule 34 provides in relevant part:

(a) *Entry of Judgment.* All formal testacy orders ... shall be reduced to judgment and the judgment shall be filed with the clerk of the court. Such judgments shall be final and immediately appealable as provided by statute.

*Any other order that fully addresses all claims raised in a petition to which it relates, but that does not finally end the proceeding, may be certified for appeal in the manner provided by Rule 54(b) of the Hawai'i Rules of Civil Procedure.*

(HRCP) Rule 54 (2003).[2] Essentially, Appellants seek review of the circuit court's May 24, 2000 findings of fact (FOF), conclusions of law (COL), and order with respect to a petition for interpretation, discussed more fully *infra*. The circuit court determined that, for purposes of distribution of the corpus upon the termination of the trust, the stirpital root[3] is set at the level of Damon's children, and, thus, the corpus is to be divided into two equal shares, representing Damon's two deceased children, both of whom left surviving issue, with the descendants of Damon's children taking per stirpes.

On appeal, Appellants essentially contend that the circuit court erred in setting the stirpital root at the level of Damon's children. Specifically, M. Haig and three of the four groups of respondents-appellants maintain that the stirpital root should be set at the level of Damon's great-grandchildren, and the remaining group of respondents-appellants maintain that the stirpital root should be set at the level of Damon's grandchildren.

For the reasons discussed more fully *infra*, we hold that Appellants' contentions lack merit. Accordingly, we affirm the circuit court's June 21, 2002 amended judgment.

## II. *BACKGROUND*

### A. *Factual Background*

On November 10, 1914, Damon executed his last will and testament (the will), creating the trust to administer his estate upon his death. Damon's estate consisted of considerable land holdings, including Moanalua Gardens, various business interests, and other assets. At the time Damon executed his will, three of his four children, Mary, Henry, and Douglas, were alive. Damon's fourth child, Samuel, had died in 1904, leaving four children. One of Samuel's children died as an infant in 1905, and Samuel's other three children were alive when Damon executed his will. Damon's child, Henry, also had one child, Harriet D. Baldwin, who was then Henry's only child and was alive when Damon executed his will.

On January 12, 1918, Damon was declared incompetent, and an order for appointment of guardianship was filed with the circuit court. Damon died on July 1, 1924, survived by his widow and his three children (Mary, Henry, and Douglas). Two of Damon's three grandchildren by Samuel predeceased Damon without any issue. Therefore, only one of Samuel's four children, Samuel R. Damon, survived Damon. Also surviving Damon was Henry's child, Harriet D. Baldwin, previously mentioned, and Henry's three additional children, Frances Holt, Joan Haig (J. Haig), and Henry E. Damon. Damon's two other children, Mary and Douglas, did not have any children, and both ultimately died without issue. Thus, at the time of Damon's death, Damon was survived by his widow, three of his four children, and five of his eight grandchildren. While four of Damon's surviving grandchildren (Harriet D. Baldwin, Frances Holt, J. Haig, and Henry E. Damon) descended from Damon's son Henry's line, only one of Damon's surviving grandchildren (Samuel R. Damon) descended from Damon's son Samuel's line. No more grandchildren were born after Damon's death.

Damon's will was admitted to probate following Damon's death in 1924. The ten-page will consisted of four numbered sections and was virtually devoid of any punctuation. The will was prefaced with routine administrative matters, including provisions dictating the payment of debts and funeral expenses, the creation of the trust, and the selection of the initial trustees. The first section of the will

---

(Emphasis added.)

**2.** HRCP Rule 54 provides in pertinent part:

(b) *Judgment upon multiple claims or involving multiple parties.* When more than one claim for relief is presented in an action . . . or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

In the absence of such determination and direction, any . . . form of decision . . . which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties[.]

**3.** The terms "stirpital root," "root," "stirps," and "stock" will be used interchangeably throughout this opinion.

instructs the trustees to maintain Moanalua Gardens for the recreation and enjoyment of the public and to distribute the flowers, fruits, and "other vegetable products" of Moanalua Gardens to Damon's widow and, upon her death, "to such of my children as shall continue to live in equal shares[.]" After the death of his widow and children, the flowers, fruits, and other vegetable products were to form part of Damon's residuary estate. The second section of the will essentially provides that the trustees have discretion in managing Damon's business interests. The third section of Damon's will provides that a portion of the income of the trust is to be used for the maintenance of Moanalua Gardens.

The fourth section of the will contains, *inter alia*, Damon's instructions for the distribution of income and corpus from the trust, providing in relevant part:

> To pay the balance of the said net income to my said wife during her life and on her death and for and during the period of the life of the last survivor of all of my children and grandchildren who shall be living at my decease to pay one-fourth of the said balance of the said net income to my daughter Mary Damon during her life and on her death to her issue such issue in every case taking in succession by right of representation and to pay one-fourth of the said balance of the said net income to my son Henry F. Damon for his life and on his death to his issue such issue in every such case taking in succession by right of representation and to pay one-fourth of the said balance of the said net income to my son Douglas Damon for his life and on his death to his issue such issue in every such case taking in succession by right of representation and to pay the remaining one-fourth of the said balance of the said net income to the children of my deceased son Samuel E. Damon and the survivors and last survivor of them during their his or her lives or life provided however that if any of the children of the said Samuel E. Damon shall die leaving any child or children him or her surviving then and in every such case last mentioned child or children shall take the share of the one-fourth of the said balance of the said net income during his her or their lives or life which his her or their parent would have taken if such parent had continued to live and on the death of the last survivor of the children of the said Samuel E. Damon my trustees shall pay the one-fourth of the said balance of the said net income during the life of the last survivor of all of my children and grandchildren who shall be living at my decease to all of the issue of my said son Samuel E. Damon such issue in every such case taking in succession by right of representation provided however and I hereby declare that on the death of any of my children without leaving lawful issue him or her surviving or on the failure of the issue of any of my children whether living at my death or dying in my lifetime then and in every such case the share of the balance of the said net income of my said residuary estate which my said child so dying or the issue of any of my said children so dying would be entitled to if living and any additional share or shares which may accrue or be added thereto by virtue of this present proviso shall thereafter go and accrue by way of addition to the share or shares of my other children or child or the issue of my other children or child who shall be dead of the said balance of the said net income *And on the death of the last survivor of all of my children and grandchildren who shall be living at the time of my death my trustees shall hold all of my said property of every description nature or kind whatsoever and wheresoever the same may be IN TRUST for all of my issue who shall then be living per stirpes and not per capita[.]*

(Emphasis added.) The non-emphasized provision constitutes the income distribution provision and has not faced any legal challenge. Pursuant to the income distribution provision, following the death of Damon's widow and the deaths of Mary and Douglas (Damon's two children who died without issue), the trustees were to distribute the remaining income, after deducting maintenance expenses relating to Moanalua Gardens and other administrative expenses, as follows: (1) one-half to the issue of Samuel Damon, by representation in each generation; and (2)

one-half to the issue of Henry Damon, by representation in each generation. The emphasized provision constitutes the corpus distribution provision and is at the center of dispute in this case.[4]

### B. Earlier Proceedings

On January 17, 1992, the trustees[5] filed a petition for instructions regarding the termination of the trust (petition for instructions) with the circuit court. Therein, the trustees stated that, based upon the language of the will and principles of will construction, the trust could be construed to terminate either: (1) upon the death of the last survivor of Damon's children and grandchildren living at the time of his death, i.e., the last measuring life; or (2) twenty-one years after the death of such last survivor or last measuring life. At the time of filing, all of Damon's children had already died. However, three of Damon's grandchildren (Frances D. Holt, Harriet D. Baldwin, and J. Haig), who were living at the time of his death, were still alive, although they were all in their seventies. The circuit court entered an order granting the petition for instructions and issued instructions to the trustees to continue the trust for twenty-one years after the death of the last measuring life, i.e., the last survivor of Damon's three living grandchildren.

However, on March 30, 1994, this court vacated the circuit court's order and remanded for issuance of instructions to terminate the trust upon the death of the last measuring life. *Trust Created Under the Will of Damon*, 76 Hawai'i 120, 869 P.2d 1339 (1994) (*Damon I*). Thus, pursuant to *Damon I*, the trust was to terminate upon the death of the last survivor of Damon's three living grandchildren, Frances D. Holt, Harriet D. Baldwin, and J. Haig.

### C. Procedural History

#### 1. The Per Stirpes Petition

On April 8, 1998, anticipating the termination of the trust,[6] M. Haig, a great-grandchild of Damon and a grandchild of Henry Damon, filed the Petition Seeking an Interpretation of the Will of Samuel Mills Damon as it Relates to the Distribution of the Corpus at Termination of the Trust (the per stirpes petition) with the circuit court. Therein, M. Haig acknowledged that Damon intended a per stirpes, rather than a per capita, distribution of the corpus, as mandated by the corpus distribution provision. M. Haig specifically sought a determination as to whether Damon intended the stirpital root to be set at the level of Damon's: (1) children; (2) grandchildren; or (3) great-grandchildren.

According to the per stirpes petition, if the stirpital root is set at the level of Damon's children, then this produces two shares, one for the descendants of Samuel Damon and one for the descendants of Henry Damon, resulting in the same distribution scheme as income. If the stirpital root is set at the level of Damon's grandchildren, then this

---

4. Although not apparent from the record, we note that one group of respondents-appellants mention in their opening brief that the value of Damon's estate at distribution could well approach one billion dollars.

5. At the time, the trustees of Damon's trust were D. Hebden Porteus, David M. Haig, Fred C. Weyand, and Paul Mullin Ganley. The current trustees remain the same, except Walter A. Dods, Jr. has replaced D. Hebden Porteus. David M. Haig is also the son of J. Haig, thus, making him Damon's great-grandchild.

6. At the time, Frances D. Holt, Harriet D. Baldwin, and J. Haig were still alive. However, on March 12, 2004, after the notice of appeal was filed for the instant case, counsel for one group of respondents-appellants filed a Suggestion of Death with this court, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(a) (2003)

(relating to filing a motion suggesting the death on the record after the filing of the notice of appeal), stating that Frances D. Holt and Harriet D. Baldwin had passed away.

Moreover, J. Haig had also passed away during the pendency of the instant appeal, thus, triggering the termination of the trust. Consequently, on January 23, 2006, this court approved the motion for substitution of M. Haig as the executor of the estate of J. Haig. Inasmuch as the briefings for this appeal were completed while J. Haig was still alive, we continue to refer to J. Haig simply as "J. Haig," rather than "M. Haig, as executor of the estate of J. Haig." Because J. Haig was still alive at the time the instant matter was considered by the circuit court, we also refer to her in the discussion as a live person.

produces five shares, one for the descendants of Damon's five grandchildren (Samuel R. Damon, Harriet D. Baldwin, J. Haig, Frances D. Holt, and Henry E. Damon). And, if the stirpital root is set at the level of Damon's great-grandchildren, then this produces eighteen shares, one for each of Damon's great-grandchildren or the issue of any who predeceases trust termination, assuming either that: (1) the now-living great-grandchildren are still alive at trust termination and no new great-grandchildren are born or adopted in; or (2) any great-grandchild now living who dies before trust termination leaves issue then surviving.[7] In addition, M. Haig also requested the circuit court to award reasonable attorneys' fees and costs from the corpus of the trust to any beneficiary appearing and rendering assistance in the present matter.

7. At the time M. Haig filed the per stirpes petition, one of Damon's eighteen great-grandchildren, Heather D. Sorenson, had already passed away. However, Sorenson left surviving issue who would take her share by representation.

8. Specifically, the four descendants are: (1) M. Haig; (2) Christopher D. Haig (C. Haig); (3) Wendy Haig (W. Haig); and (4) J. Haig. M. Haig, C. Haig, and W. Haig are the children of J. Haig. As previously stated, J. Haig is one of Damon's grandchildren and is one of Henry Damon's children. On appeal, J. Haig and W. Haig [hereinafter, collectively, J. & W. Haig] jointly filed an opening brief, arguing that the stirpital root should be set at the level of Damon's great-grandchildren.

At the circuit court level, respondents-appellants Brendan D. Mesker and John P. Damon individually filed statements of no position regarding the per stirpes petition. On appeal, Brendan D. Mesker and John P. Damon [hereinafter, collectively, Mesker & J. Damon] jointly filed an opening brief, contending that the stirpital root should be set at the level of Damon's great-grandchildren. Mesker and J. Damon are the children of Henry E. Damon, the grandchildren of Henry Damon, and the great-grandchildren of Damon and, thus, also descend from Damon's son Henry's line.

Therefore, on appeal, the following four groups of respondents-appellants submitted that the stirpital root should be set at the level of Damon's great-grandchildren: (1) M. Haig; (2) C. Haig; (3) J. & W. Haig; and (4) Mesker & J. Damon.

9. Specifically, this group of descendants is comprised of eight individuals, respondents-appellants: (1) Frances D. Holt; (2) Daniel F. Holt; (3) Allison H. Gendreau; (4) Melanie F.H. Bostock; (5) Harriet D. Baldwin; (6) Peter D. Baldwin; (7) Bennet M. Baldwin; and (8) Katherine

In response to the per stirpes petition, several of Damon's descendants asserted three different positions as to which generation of Damon's descendants, *i.e.*, Damon's children, grandchildren, or great-grandchildren, should serve as the stirpital root for the purpose of distributing the corpus upon termination of the trust. Four descendants, all descending from Damon's son Henry's line, contended that the stirpital root should be set at the level of Damon's great-grandchildren.[8] One group of descendants, also descending from Damon's son Henry's line, asserted that the stirpital root should be set at the level of Damon's grandchildren.[9] Finally, three groups of descendants, all descending from Damon's son Samuel's line, alleged that the stirpital root should be set at the level of Damon's children.[10]

B. Achaval [hereinafter, collectively, Holt & Baldwin Families]. As previously stated, Frances D. Holt and Harriet D. Baldwin are Damon's grandchildren and Henry's children, and their deaths have been suggested on the record by counsel. Daniel F. Holt, Allison H. Gendreau, and Melanie F.H. Bostock are the legally adopted children of Frances D. Holt. Peter D. Baldwin, Bennet M. Baldwin, and Katherine B. Achaval are the children of Harriet D. Baldwin.

10. Specifically, these three groups of descendants, comprising of twelve individuals, are respondents-appellees: (1) Sharon Damon, Siddhartha Damon, and Shawnna Sorenson [hereinafter, collectively, Sharon Damon Appellees]; (2) Heidi Snow, Julia Snow, and Frank Snow [hereinafter, collectively, Snow Appellees]; and (3) Samuel E. Damon, Samuel Renny Damon, Pia Spee, Julio Spee, Miles Spee, and Philip Spee [hereinafter, collectively, Spee Appellees].

With respect to Sharon Damon Appellees, Sharon Damon is the child of Samuel R. Damon, the grandchild of Samuel Damon, and the great-grandchild of Damon. Shawnna Sorenson is the child of Heather D. Sorenson, Damon's only deceased great-grandchild. Heather D. Sorenson and Sharon Damon were sisters.

With respect to Snow Appellees, Heidi Snow is Shawnna Sorenson's sister and, thus, a great-great-grandchild of Damon. Julia Snow and Frank Snow are Heidi Snow's children.

And, with respect to Spee Appellees, Samuel E. Damon is the child of Samuel R. Damon, the grandchild of Samuel Damon, and the great-grandchild of Damon. In other words, Samuel E. Damon, Sharon Damon, and Heather D. Sorenson were siblings. Samuel Renny Damon and Pia Spee are Samuel E. Damon's children. Julio

On May 24, 2000, the Honorable Virginia Lea Crandall issued her "Findings of Fact, Conclusions of Law, and Order Interpreting the Will of Samuel Mills Damon as it Relates to Distribution of Trust Corpus Upon Termination of the Samuel Mills Damon Trust and Instructing Trustees as to Determination of Stirps" (the May 24, 2000 FOFS, COLS, and Order). Therein, the circuit court found in favor of the interpretation advocated by the three groups of descendants descending from Damon's son Samuel's line, *i.e.*, that the stirpital root is to be set at the level of Damon's children. The circuit court entered the following relevant conclusions [11]:

[3.] The intent of [Damon] with respect to the [corpus] of the [t]rust, as again expressed by [the fourth section of Damon's will], was that it be distributed upon termination (which the Supreme Court of Hawai'i in *Damon I* determined to be at the death of the last grandchild of [Damon]) to "all of [my] issue who shall then be living per stirpes and not per capita." There is no ambiguity in the [w]ill as to the intent of [Damon] to avoid a per capita distribution of the [t]rust [corpus]. The direction in [the fourth section of Damon's will] to distribute "per stirpes and not per capita" precludes any interpretation of the [w]ill that would permit the descendants of [Damon] to take in their own right rather than by representation.

[4.] The Holt and Baldwin [F]amilies have argued that this Court should "harmonize" the [corpus] distribution provision with the [w]ill as a whole and find that the stirps begin at the level of the grandchildren of [Damon]. The Court is not persuaded by this argument.

[5.] [M. Haig], [C. Haig], and [J. Haig] have argued that the language of the [w]ill evidences [Damon's] intent that the stirps for calculating the distribution of the [corpus] of the [t]rust should be found at the first generational level at which there are living issue who share in

the [corpus] distribution. That would likely result in the stirps being set at the level of [Damon's] great-grandchildren. This argument is based in part on [Damon's] use of different language in directing disposition of the [corpus] ("per stirpes" and among "all of my issue who shall then be living") than he used for directing distribution of income ("by right of representation" among the issue of named children) and on the theory that if [Damon] had intended the same distribution of both principal and income, he would have used the same language in directing their disposition.

[6.] While differing words are indeed used, the Court concludes that they do not evidence a difference in intent or meaning. In fact, the Court concludes that the words "per stirpes" as used with respect to the distribution of [corpus] and the words "by right of representation" as used with respect to the distribution of net income mean the same thing. [discussing cases and citing cases from other jurisdictions holding that "per stirpes" means "by representation"].

[7.] One common method of determining the meaning of "per stirpes," in cases where the first takers are descended from the prior income takers, is to presume that the [corpus] upon termination will be distributed in the same manner as income was distributed prior to termination. Despite arguments that [Damon] intended the income and [corpus] of the [t]rust to be distributed differently because of different language and punctuation in the income distribution [provision] and [corpus] distribution [provision], the Court is not persuaded that any language, punctuation (or lack thereof) or capitalization in the [w]ill demonstrates or reflects an intent to treat the distribution of corpus differently from the distribution of income. The

Spee, Miles Spee, and Philip Spee are Pia Spee's children.

11. The May 24, 2000 FOFs, COLs, and Order did not contain any numbering system for the COLs. However, each COL was separated into distinct paragraphs, and we note that some of the parties on appeal had self-numbered the COLs at the beginning of every new paragraph. Thus, we did the same for ease of discussion.

differing language, capitalization and punctuation cited reflect a distinction without a difference.

[8.] The Hawai'i Supreme Court used similar reasoning in Trust Estate of Dwight, 80 Hawai'i 233, 908[909] P.2d 561 [ (1995) ]. In that case the testator had provided for trust income to be distributed to his children (one daughter and two adopted grandchildren) per stirpes until all of them had died. The corpus was then to be distributed to "the issue of my said adopted children as shall then be living in equal shares per stirpes." The Court held that the stirpital root "begins with the ancestors of those who are to take and not with the takers themselves." Id. at 235, 908[909] P.2d at 563. In reaching its conclusion, the Court noted that the testator "intended distribution of the trust corpus to parallel income distribution." Id. at 238, 908[909] P.2d at 566.

[9.] Many courts have wrestled with the meaning of "per stirpes" in wills and have relied on American cases involving trusts for a testator's own children to determine the testator's issue. Absent very unusual facts, they almost uniformly find the stirps at the generation of testator's children. [discussing In re Morton's Estate, [48 N.J. 42,] 222 A.2d 185 (N.J.1966) ].

. . . .

[11.] When [Damon] provided in [the fourth section of his will] that the [corpus] of the [t]rust would be distributed upon its termination (as determined in Damon I) to "all of my issue who shall then be living per stirpes," he [ ] intended that the stirps should be set at the level of his children.

[12.] [M. Haig] has argued that the new Uniform Probate Code, Hawai'i Revised Statutes ("HRS") §§ 560 et. seq., which became effective January 1, 1997, provides the intestacy law as the default rule in interpreting class gifts. HRS § 560:2–708 follows an intestacy scheme of distribution for class gifts to issue. HRS §§ 560:2–103 ("share of heirs") and 560:2–708 do not apply to the class gift

herein because [Damon] specified the manner of his intended distribution. The Uniform Probate Code provisions apply only when the testamentary instrument is silent as to the manner of distribution.

(Footnotes omitted.) Finally, the circuit court ordered, inter alia, that:

3. For purposes of distribution of the corpus upon termination of the [t]rust, the Court finds and concludes that the stirps are the ancestors of the takers and not the first takers and that the stirps are the children of [Damon] as [Damon] is the common ancestor from whom representation begins.

4. The Trustees are instructed that for purposes of distribution of the corpus upon termination of the [t]rust, the division of the stirps shall be made at the level of the children of [Damon].

## 2. The Fee Bearing Petition, the Fee Bearing Order, the Fee Petition, and the Fee Order

Shortly after M. Haig filed the per stirpes petition but prior to the entry of the May 24, 2000 FOFs, COLs, and Order, trustees/respondents-appellees David M. Haig, Fred C. Weyand, Paul Mullin Ganley, and Walter A. Dods, Jr. [hereinafter, collectively, the trustees] filed a "Petition for Court Appointment of Attorneys to Brief the Issues Raised in the Per Stirpes Petition and to Have Beneficiaries Pay for the Legal Expenses of Attorneys They Retain" (the fee bearing petition) with the circuit court on April 22, 1998. Therein, the trustees sought an order determining that Damon's estate should not be required to pay for the beneficiaries' fees and costs or, in the alternative, to either have the circuit court: (1) appoint three attorneys, one to represent the interests of those asserting each of the three positions on the question of where the stirpital root should be set; or (2) determine that Damon's estate be responsible for the reimbursement of only one reasonable fee for each of the three positions.

On June 26, 1998, the circuit court entered an order (1) denying with prejudice the trustees' request for the appointment of three attorneys and (2) denying without prejudice

the trustees' alternative requests that (a) Damon's estate not be required to pay for the fees and costs of attorneys hired by the beneficiaries and (b) Damon's estate be required to pay only one reasonable fee for each of the three positions (the fee bearing order).

On June 5, 2000, J. Haig filed a "Petition for Court's Instructions to the Trustees Regarding Reimbursement of Attorneys' Fees and Request for Reimbursement of Attorneys' Fees From Trust Funds" (the fee petition) with the circuit court. Therein, J. Haig requested reimbursement of the $124,832.72 in attorneys' fees and costs she had incurred in connection with the per stirpes petition and the fee bearing petition.[12]

On June 19, 2001, the circuit court entered an order granting in part and denying in part the various requests for attorneys' fees and costs by the parties (the fee order). With respect to J. Haig's fee petition, the fee order provided in relevant part:

IT IS ORDERED:

. . . .

10. With respect to [the fee petition], counsel [for J. Haig] provided assistance to the Court by providing copies of cases from other jurisdictions, addressing issues involving multiple attorneys representing the same position, and assisting in resolving the Per Stirpes FOF/COL among the parties. However, [the fee petition] contains no specific declaration or separate statement from [J. Haig] describing any impact on her estate planning interest. Throughout the time sheets, there are repeated references to telephone calls and letters to [M. Haig], but no indication of communications with [J. Haig]. In assessing the reasonableness of fees, and whether [Damon's estate] should bear the costs of her participation, the Court wants to make certain that [M. Haig] did not retain Mr. [Carroll S.] Taylor [M. Haig's own counsel] and Mr. [A. James] Wriston [J. Haig's counsel] to present two different posi-

tions before the Court.[13] This is not the case with the Holt–Baldwin Fee Petition, which was filed by one firm for multiple people ([J. Haig]'s sisters and their children). . . .

*Therefore, although [J. Haig] is an income beneficiary, she does not have standing in this matter and her petition is denied. However, to the extent that counsel for [J. Haig] provided assistance to the Court, the Court awards reimbursement in the amount of $35,000 to reflect the value provided to the Court and to [Damon's estate].*

(Emphasis added.)

### 3. Judgment and Appeal

On November 6, 2001, the circuit court entered a judgment, incorporating, *inter alia,* the May 24, 2000 FOFs, COLs, and Order, the fee bearing order, and the fee order (the November 6, 2001 entry of judgment). Appellants timely appealed from the November 6, 2001 entry of judgment. However, on May 30, 2002, this court dismissed the appeals for lack of appellate jurisdiction inasmuch as the November 6, 2001 entry of judgment was not certified for appeal pursuant to HRCP Rule 54(b). *Trust Created Under the Will of Damon,* No. 24740.

On June 21, 2002, the circuit court entered an amended judgment, again incorporating, *inter alia,* the May 24, 2000 FOFs, COLs, and Order, the fee bearing order, and the fee order, pursuant to HRCP Rule 54(b) and HPR Rule 34. This timely appeal followed.

## II. *STANDARDS OF REVIEW*

### A. *Standing*

■ This court reviews a circuit court's decision regarding a party's standing *de novo* under the right/wrong standard. *Mottl v. Miyahira,* 95 Hawai‘i 381, 388, 23 P.3d 716, 723 (2001).

---

12. Many of the respondents-appellants and the respondents-appellees also filed their own fee petitions; however, none of their fee petitions are at issue in this case.

13. M. Haig, J. Haig's son, served as J. Haig's attorney-in-fact.

## B. *Construction of a Trust*

The construction of a testamentary trust is a question of law which this court reviews *de novo* under the right/wrong standard. *Damon I,* 76 Hawai'i at 123–24, 869 P.2d at 1342–43 (citation omitted).

> When construing a trust, this court is guided by principles relating to the interpretation of trusts as well as those relating to the interpretation of wills. A fundamental rule when construing trusts is that the intention of the settlor as expressed in a trust instrument shall prevail unless inconsistent with some positive rule of law. Additionally, in construing a trust document to determine the settlor's intent, the instrument must be read as a whole, not in fragments.

*In re Lock Revocable Living Trust,* 109 Hawai'i 146, 151–52, 123 P.3d 1241, 1246–47 (2005) (internal quotation marks and citations omitted).

## III. *DISCUSSION*

Preliminary, we address whether J. Haig had standing to participate in the matter of the construction of the instant will. As previously stated, the circuit court concluded in the fee order that J. Haig lacked standing to participate in the instant matter, and, thus, her fee petition was denied. Thereafter, we address the crux of the instant appeal, *i.e.,* the construction of the corpus distribution provision of the will.

## A. *Standing*

J. & W. Haig maintain on appeal that the circuit court erred in determining that J. Haig, a current income beneficiary of the trust, lacked standing to participate in the instant matter concerning the distribution of the corpus upon termination of the trust. J. & W. Haig contend that J. Haig is an "interested person" under Hawai'i Revised Statutes (HRS) § 560:1–201 (Supp.2004), quoted *infra,* and, therefore, J. Haig has standing. In addition, J. & W. Haig argue that J. Haig "has standing in this matter by virtue of her estate planning interest in the outcome of the per stirpes petition." Specifically, J. & W. Haig assert that the percentage of the corpus J. Haig's children will eventually inherit upon

termination of the trust has a "self-evident effect on the amounts that [J. Haig] may wish to bequeath to them and the amounts she can comfortably bequeath to others."

In response, the trustees contend that, in order to have standing for purposes of the instant matter, J. Haig must have a property right in, or claim against, Damon's estate at issue in the instant proceeding. The trustees argue that J. Haig is not an interested person under HRS § 560:1–201 inasmuch as (1) the per stirpes petition requested a judicial determination regarding the distribution of the corpus upon termination of the trust and (2) J. Haig does not stand to inherit any of the corpus. In response to the trustees' contentions, J. & W. Haig counter that the trustees interpret section 560:1–201 "too narrowly" and, instead, submit that the section contemplates "instances where a party who otherwise has no property right in or claim against an estate may nevertheless be an interested person for a particular proceeding only."

HRS § 560:7–201(a) (1993) provides that "[t]he [probate] court has jurisdiction of proceedings initiated by trustees and *interested persons* concerning the internal affairs of trusts." (Emphasis added.) In turn, HRS § 560:1–201 defines "interested person" as

> includ[ing] heirs, devisees, children, spouses or reciprocal beneficiaries, creditors, beneficiaries, and any others having a property right in or claim against a trust estate or the estate of a decedent, ward, or protected person. It also includes persons having priority for appointment as personal representative, and other fiduciaries representing interested persons. *The meaning as it relates to particular persons may vary from time to time and must be determined according to the particular purposes of, and matter involved in, any proceeding.*

(Emphasis added.) This court recently construed the last sentence in the foregoing definition of interested persons in *In re Estate of Campbell,* 106 Hawai'i 453, 106 P.3d 1096 (2005). Therein, this court stated that

> [t]he last sentence of the definition does not broaden the definitional reach of "in-

terested person." *Rather[,] it allows the court to determine the sufficiency of a party's interest relative to the particular probate proceeding.* It is thus possible that one may be an "interested person" for the purpose of one particular proceeding but not another .... *An interested person, however, will always possess an interest in the estate itself.*

*Id.* at 459, 106 P.3d at 1102 (quoting *Estate of Thorne,* 704 A.2d 315, 318 (Me.1997) (brackets omitted)) (some emphases in original and some added). In addition, this court also cited to *In re Estate of Juppier,* 81 S.W.3d 699, 701 (Mo.Ct.App.2002), for the proposition that an interested person "only include[s] those with a financial interest in an estate." *In re Estate of Campbell,* 106 Hawai'i at 459, 106 P.3d at 1102 (internal quotation marks omitted).

In *Estate of Thorne,* the natural father of a child (the child) who was killed in an automobile accident brought a wrongful death action against the driver and the driver's employer [hereinafter, collectively, the wrongful death defendants]. 704 A.2d at 316. The adoptive father of the child's brother subsequently filed a petition for determination of the child's heirs. *Id.* The probate court determined that the termination of parental rights acted to sever any inheritance rights that the natural father had in the child's estate and that the child's immediate heirs were his brother and half sister. *Id.* at 316–17. Consequently, the wrongful death defendants moved to intervene in the probate proceedings, seeking reconsideration of the determination of the child's heirs. *Id.* at 317. The probate court denied the wrongful death defendants' motion. *Id.* On appeal, the Supreme Judicial Court of Maine affirmed, noting that

[t]he determination of [the child's] heirs will affect on whose behalf the wrongful death action may be brought and consequently may affect the determination of damages in that action. The sole interest of the [wrongful death defendants] in the determination of [the child's] heirs is the minimization of the extent of their poten-

tial liability in the wrongful death action. They attempt to serve this interest by advocating the heirship rights of the heirs most likely to recover the least amount of damages in the wrongful death action. Their interest is not a "property right in or claim against" [the child's] estate. The [wrongful death defendants] fall outside the scope of [Maine's statutory definition of interested persons][14] and lack standing as "interested parties" to participate in the determination of [the child's] heirs.

*Id.* at 318.

Likewise, in the instant case, J. Haig falls outside the scope of HRS § 560:1–201 and lacks standing as an interested party to participate in the determination of the residuary beneficiaries of the trust. The particular purpose of the instant probate proceeding is to determine where to place the stirpital root in order to ascertain the amount each residuary beneficiary will receive upon termination of the trust. Although J. Haig is currently an income beneficiary, she does not have any interest *in* Damon's estate that will be affected by *this* particular probate proceeding inasmuch as she is merely a measuring life and not a residuary beneficiary. Moreover, similar to the wrongful death defendants in *Estate of Thorne,* J. Haig may have a financial interest in *how* Damon's estate will ultimately be distributed; however, her interest is not a property right in or claim against Damon's estate. Thus, J. Haig's interest relative to the instant probate proceeding is insufficient for her to be considered an interested person. Accordingly, we hold that the circuit court correctly concluded that J. Haig lacked standing to participate in the instant matter.

Furthermore, J. & W. Haig also request that this court remand the issue of J. Haig's award of attorneys' fees for "reconsideration" inasmuch as beneficial value to the trust and the court, not standing, is the prerequisite for an award of attorneys' fees. Stated differently, J. & W. Haig apparently argue that the circuit court improperly considered J. Haig's lack of standing as a factor in reducing the amount of attorneys' fees awarded to

---

**14.** The relevant portion of Maine's statutory definition of interested persons is identical to Ha-

waii's statutory definition of interested persons. *See* 18–A M.R.S. § 1–201(20) (1981).

her. However, based on the transcript of the hearing on the fee petition, it is apparent that the circuit court did not, as J. & W. Haig claim, reduce the amount of attorneys' fees awarded to J. Haig as a result of J. Haig's lack of standing. Instead, the circuit court awarded J. Haig $35,000 in attorneys' fees to reflect the beneficial value provided to the trust. The circuit court stated:

> And so the Court would make a—I guess lump sum order of payment in the amount of payment of $35,000 to [J. Haig's law firm] as a benefit that they provided to the Court notwithstanding generally that she does not have standing on this particular issue, *but to reflect the value to the state [sic] that was provided.*

(Emphasis added.) Thus, based on the foregoing, it reasonably appears that the circuit court awarded J. Haig $35,000 in attorneys' fees *in spite of* her lack of standing, *not as a result* of her lack of standing. Accordingly, we decline to remand the issue of J. Haig's award of attorneys' fees for reconsideration.

### B. *Interpretation of Damon's Will*

■ As previously stated, M. Haig, C. Haig, J. & W. Haig, and Mesker & J. Damon essentially contend that the stirpital root should be set at the level of Damon's great-grandchildren. Holt & Baldwin Families assert that the stirpital root should be set at the level of Damon's grandchildren. And, Sharon Damon Appellees, Snow Appellees, and Spee Appellees [hereinafter, collectively, Appellees] maintain that the circuit court correctly concluded that the stirpital root is set at the level of Damon's children.

#### 1. Meaning of "Per Stirpes"

C. Haig and J. & W. Haig contend that Damon intended a "modified per stirpes" or, in other words, a "per capita with representation," distribution of the corpus. Relying heavily upon the Restatement (First) of Property (First Restatement) and the Restatement (Third) of Property (Third Restatement), they specifically argue that per stirpes has four different meanings, to wit: (1) "strict per stirpes;" (2) modified per stirpes or per capita with representation; (3) "per-capita-with-per-capita representation;"

and (4) "per-capita-at-each-generation." Mesker & J. Damon argue that per stirpes has two distinct meanings, to wit: (1) "taking by right of representation" and (2) taking "collectively by families and not equally as individuals." Nonetheless, all three groups of appellants contend that *Trust Estate of Dwight*, 80 Hawai'i 233, 909 P.2d 561 (1995), which adopted certain provisions of the Restatement (Second) of Property (Second Restatement), is inapplicable to the instant case. Based on the foregoing, C. Haig, J. & W. Haig, and Mesker & J. Damon essentially conclude that Damon intended the stirpital root to be at the generation where there would likely be at least one living descendant at the time the trust is terminated, *i.e.,* the level of great-grandchildren.

In response, Sharon Damon Appellees contend that the four "meanings" of per stirpes, as advocated by C. Haig and J. & W. Haig, are irrelevant because the Third Restatement "addresses these meanings in the context of intestacy statutes that have evolved as state legislatures exercise their public policy prerogative, not per stirpes provisions utilized in wills." Sharon Damon Appellees contend that the other two definitions of per stirpes, as advocated by Mesker & J. Damon, are not supported by any Hawai'i authority, and Mesker & J. Damon neglect *Dwight's* precise definition of per stirpes. Moreover, Appellees all agree that this court has already established that per stirpes has one distinct meaning, and, thus, *Dwight* has already resolved the "Restatement problem," *i.e.,* whether Hawai'i follows the First, Second, or Third Restatement with respect to the meaning of per stirpes, by adopting the pertinent provisions of the Second Restatement.

> This court has recently reaffirmed that
>
> it is **well-established** that "per stirpes" means "by or according to root," "according to or by stock," or "by right of representation," *i.e.,* that the descendants are to take through or as representatives of a parent. *Dwight*, 80 Hawai'i 233, 235, 909 P.2d 561, 563 (1995) (citing Restatement (Second) Property (Donative Transfers) §§ 25.9 and 28.2 (1988)). **Moreover, implicit in the phrase is the concept that**

the "root" or "stock" begins with the ancestors of those who are to take and not with the takers themselves. *Id.*

*In re Lock,* 109 Hawai'i at 152–53, 123 P.3d at 1247–48 (some internal quotation marks, citation, and footnote omitted) (bold emphases added). In construing a will that was executed in 1926, this court in *Dwight* declared that, under a per stirpes distribution scheme as recognized in Hawai'i,

> the [Second] Restatement requires the initial division to be in the first generation, whether or not there is a survivor, and then permits the living descendants in the next generation to succeed to that share....
>
> ....
>
> ... The rationale for the initial division into shares on the basis of the number of class members in the first generation below the settlor is that division of the trust corpus should be kept equal among family lines.

*Dwight,* 80 Hawai'i at 236–37, 909 P.2d at 564–65 (citation omitted) (emphases added). Thus, *In re Lock* and *Dwight* acknowledge that, under Hawai'i law, per stirpes has a well-established and distinct meaning.

As previously mentioned, Damon's corpus distribution provision states: "[F]or all of my issue[15] who shall then be living per stirpes and not per capita." Inasmuch as Damon clearly intended a per stirpes distribution rather than a per capita distribution, the foregoing definition of per stirpes is applicable to the instant case. In accordance with *Dwight* that the stirpital root begins with the ancestors of those who are to take and not with the takers themselves, the stirpital root

should not be at the level of Damon's great-grandchildren, who are the takers, but rather at the level of Damon's children, who are the ancestors of the takers. Such an interpretation leads to an equal division of the corpus among family lines as, in this case, between Damon's son Henry's line and Damon's son Samuel's line. Thus, C. Haig, J. & W. Haig, and Mesker & J. Damon's arguments with respect to the various definitions of per stirpes and their resulting conclusion that the stirpital root is at the level of Damon's great-grandchildren is without merit.

C. Haig, Mesker & J. Damon, and M. Haig next contend that, in 1996, the Hawai'i legislature rejected *Dwight's* reliance on the Second Restatement with respect to the interpretation of a class gift to issue. According to these appellants, the 1996 amendments to Hawai'i's probate code adhere to the interpretation of the First Restatement rather than the Second Restatement, and, thus, the circuit court's reliance on *Dwight* was incorrect. Specifically, Mesker & J. Damon argue that HRS § 560:2–708 (Supp.2004), quoted *infra,* relating to class gifts to issue, rejects *Dwight's* reliance on the Second Restatement inasmuch as HRS § 560:2–708 is based on the First Restatement.

However, Appellees point out that C. Haig and M. Haig do not cite to any of the 1996 amendments to Hawai'i's probate code to support their contention that *Dwight* is no longer controlling precedent. Snow Appellees contend that HRS § 560:2–708 applies only if the class gift to issue does not specify the manner in which the property is to be distributed. Snow Appellees maintain that, inasmuch as Damon's will "states that the dis-

---

**15.** This court has recently confirmed that the definition of "issue" states:

> "When the donor of property describes the beneficiaries thereof as 'issue' or 'descendants' of a designated person, the primary meaning of such class gift term is determined by substituting in place of the class gift term the words 'children' and 'children of children' and 'children of children of children,' etc. of the designated person[.]" [*Dwight*], 80 Hawai'i at 235–36[, 909 P.2d at 563–64] (quoting Restatement (Second) of Prop.: Donative Transfers § 25.9 (1988)); *see also* 3 Richard R. Powell, *Powell on Real Property* § 30.08 at 30–107 (2004) ("In a gift to the 'issue' or 'descendants' of a certain

person, these terms are understood by reference to the definition and constructional rules for the term 'children.' Thus, the terms 'children,' 'children of children,' and so forth are substituted for 'issue' and 'descendants.' "). Indeed, "[t]he term 'issue,' shorn of any and all judicial constructions and taken in its ordinary and popular sense as used in respect to pedigree ..., is definitely a general term synonymous with children, progeny, offspring, descendants, etc." *O'Brien v. Walker,* 35 Haw. 104, 109 (1939).

*In the Matter of Medeiros Testamentary Trust and Life Ins. Trust,* 105 Hawai'i 284, 290, 96 P.3d 1098, 1104 (2004) (some brackets in original).

tribution is to be made to the living issue 'per stirpes and not per capita,' the [w]ill's class gift specifies the manner of distribution, thereby avoiding classification as a failed class gift." Moreover, Appellees contend that C. Haig, Mesker & J. Damon, and M. Haig fail to mention that HRS § 560:2–709 (Supp.2004), quoted *infra*, although not retroactively applicable to the instant case, defines per stirpes in a manner consistent with *Dwight*, and, thus, *Dwight* remains controlling precedent.

HRS § 560:2–708 provides that:

If a class gift in favor of "descendants", "issue", or "heirs of the body" *does not specify the manner in which the property is to be distributed among the class members,* the property is distributed among the class members who are living when the interest is to take effect in possession or enjoyment, in such shares as they would receive, under the applicable law of intestate succession, if the designated ancestor had then died intestate owning the subject matter of the class gift.

(Emphasis added.) According to the plain language of section 560:2–708, if a class gift to issue does not specify the manner of distribution, then the applicable law of intestate succession would apply. Here, however, even assuming *arguendo* that section 560:2–708 is retroactively applicable to the trust's corpus distribution provision, Damon expressly specified the manner of distribution, *i.e.,* "per stirpes and not per capita," and, thus, the law of intestate succession is inapplicable to the instant case.[16] Inasmuch as section 560:2–708 does not apply to the instant class gift, *Dwight* remains controlling precedent.

Moreover, HRS § 560:2–709 provides in relevant part that:

(c) Per stirpes. If a governing instrument executed after January 1, 1997 calls for property to be distributed "per

stirpes," *the property is divided into as many equal shares as there are:*

(1) *Surviving children of the designated ancestor; and*

(2) *Deceased children who left surviving descendants.*

Each surviving child, if any, is allocated one share. The share of each deceased child with surviving descendants is divided in the same manner, with subdivision repeating at each succeeding generation until the property is fully allocated among surviving descendants.

(Emphases added.) We note that section 560:2–709(c) expressly states that it applies to instruments executed after January 1, 1997 and, therefore, would not apply to the instant case inasmuch as Damon executed his will in 1914. Nonetheless, section 560:2–709(c) defines per stirpes in a manner *consistent* with *Dwight.* As previously stated, *Dwight* provided that, under a per stirpes distribution scheme, "the [Second] Restatement requires the initial division to be in the first generation, whether or not there is a survivor, and then permits the living descendants in the next generation to succeed to that share." 80 Hawai'i at 236, 909 P.2d at 564 (citation omitted). Similarly, section 560:2–709(c) provides that the initial division of property is to be at the level of the designated ancestor's children, *i.e.,* the first generation, regardless of whether or not there is a survivor, as long as any deceased child left surviving descendants. Indeed, the comment to section 2–709 of the Revised Uniform Probate Code (UPC)[17] confirms this interpretation:

Subsection (c)'s definition of "per stirpes" accords with the predominant understanding of the term. In 1993, the phrase "if any" was added to subsection (c) to clarify the point that, *under per stirpes, the initial division of the estate is made at the*

---

**16.** We note that, although C. Haig and Mesker & J. Damon both argue that the Hawai'i legislature rejected the applicability of *Dwight,* they take inconsistent positions with respect to whether Damon specified a manner of distribution in his trust. Although Mesker & J. Damon contend that, "on the face of the actual words used by Damon, there is a failure to 'specify the manner in which the property is to be distributed among

the class members[,]' " C. Haig states that Damon described the distribution of his corpus "in a specified manner ('per stirpes and not per capita')."

**17.** HRS § 560:2–709(c) is taken verbatim from section 2–709(c) of the Revised UPC.

*children generation even if no child survives the ancestor.*

Unif. Probate Code § 2–709 cmt. (amended 1993) (emphasis added). Thus, the appellants' contention that the 1996 amendments to Hawaii's probate code overruled *Dwight* is not supported by any statutory language and ignores HRS § 560:2–709(c), which confirms *Dwight's* definition of per stirpes. Accordingly, we hold that the circuit court correctly concluded that the 1996 amendments to Hawaii's probate code are not applicable to the instant case.

### 2. Comparison of the Income and Corpus Distribution Provisions

■ M. Haig, C. Haig, J. & W. Haig, and Mesker & J. Damon contend that the circuit court incorrectly presumed that the corpus of the trust will be distributed in the same manner as income has been distributed. They allege that "[o]nly if identical treatment of income and corpus distribution appears to be called for in the will can courts infer a similar intent regarding both distributions." These appellants' arguments can be summarized by the following passage:

> The "glaring" difference between the two provisions refutes any assumption that Damon intended his bald and unadorned use of "per stirpes" in the corpus provision to have a meaning identical to the "by right of representation" pattern which he meticulously and repeatedly articulated for distribution of the trust income. Rather, by abandoning the "by right of representation" language he had earlier used to delineate income distribution in favor of the term "per stirpes" for the corpus, Damon evidenced an intent that corpus would be treated differently.

Appellees contend that the terms "per stirpes" and "by right of representation" are considered synonymous under *Dwight*. Moreover, Appellees allege that *Damon I's* employment of the phrase "income to my issue per stirpes" to describe the income distribution provision is further support for the notion that "by representation" and "per stirpes" mean the same thing. Finally, Sharon Damon Appellees state that "the law in Hawai'i clearly allows 'sufficient grounds for presuming' that a corpus scheme follows a similarly worded income scheme."

As previously mentioned, "it is well-established that **'per stirpes' means** 'by or according to root,' 'according to or by stock,' or **'by right of representation,'** *i.e.,* that the descendants are to take through or as representatives of a parent." *In re Lock,* 109 Hawai'i at 152–53, 123 P.3d at 1247–48 (some internal quotation marks, citation, and footnote omitted) (bold emphases added). Thus, *In re Lock* clearly reaffirms *Dwight's* proposition that "per stirpes" means "by right of representation." Moreover, other jurisdictions have also held that "per stirpes" and "by right of representation" mean the same thing. *See Lombardi v. Blois,* 230 Cal. App.2d 191, 40 Cal.Rptr. 899, 911 (1964) (" 'Per stirpes' and 'by right of representation' mean the same thing[.]" (Citations omitted.)); *Johnson v. Huntley,* 39 Wash.2d 499, 236 P.2d 776, 778 (1951) (noting that, "[i]n the law of descent and distribution, 'taking by representation' means taking 'per stirpes' " (citations omitted)).

In this case, Damon's income distribution provision essentially provided that, after the death of Damon's widow, income is to be distributed equally among the four branches of Damon's descendants, that is, each of Damon's four children are to take a one-quarter share of the net income and, upon the death of each child, their issue to take "in succession by right of representation." In other words, income is to be distributed to Damon's issue by right of representation, and, indeed, income has been distributed in this manner since the death of Damon's widow. Presently, income is distributed equally between the two branches of Damon's descendants, one share to Damon's son Henry's line and one share to Damon's son Samuel's line, inasmuch as Henry and Samuel were the only two children that left surviving issue. On the other hand, Damon's corpus distribution provision simply provided that corpus is to be distributed to "all of my issue who shall then be living per stirpes and not per capita." In other words, the corpus is to be distributed to Damon's issue per stirpes. Inasmuch as per stirpes means by right of representation, income and corpus are to be distributed in the same manner, *i.e.,* to Damon's issue by

right of representation or per stirpes. Indeed, in *Damon I*, this court characterized Damon's income distribution provision as simply "the income to my [ (Damon's) ] issue per stirpes," thus, essentially expressing the view that per stirpes and by right of representation mean the same thing. 76 Hawai'i at 123, 869 P.2d at 1342. Likewise, the appellants' contention that a corpus distribution provision can be treated similarly only if it contains identical language as the income distribution provision is without merit in this case, inasmuch as Damon employed similar language in the two provisions, to wit, per stirpes and by right of representation. *See Matter of Lopez,* 64 Haw. 44, 59, 636 P.2d 731, 741 (1981) (noting that, if a settlor of a trust wanted income and corpus distribution to be treated the same, he "naturally would have used similar language"). Thus, the "glaring" distinction between the income and corpus distribution provisions is essentially, as the circuit court noted, "a distinction without a difference." *See* COL No. 7. Accordingly, we hold that the circuit court correctly concluded that the corpus, upon termination of the trust, will be distributed in the same manner as income has been distributed and that, therefore, the stirpital root is set at the level of Damon's children.

### 3. Grammatical Analysis of Damon's Will

■ M. Haig, C. Haig, Mesker & J. Damon, and Holt & Baldwin Families contend that Damon's capitalization of the word "And" at the start of the corpus distribution provision indicates Damon's intent to treat income and corpus differently. Appellees essentially contend that Damon's intent should not be controlled by punctuation or capitalization. In addition, Spee Appellees allege that "[n]one of the [a]ppellants point to how the capitalization supports their respective contentions."

This court has previously stated that:

The intention of the testator as expressed in his will is not controlled by the punctuation therein and such punctuation may be disregarded where it conflicts with the manifest intention of the testator and by so doing the meaning of the will is made more obvious.

*In re Deering's Estate,* 29 Haw. 854, 861 (1927) (internal quotation marks and citation omitted). Other jurisdictions have similarly applied the foregoing analysis to the interpretation of the use of capitalization in wills and trusts as well. *See Wilson v. Witt,* 215 Ala. 685, 112 So. 222, 224 (1927) ("The natural sense in which words are used, as it appears from judicial inspection, prevails over punctuation and capitals[.]") (citations and internal quotation marks omitted); *Home for Incurables of Baltimore City v. Bruff,* 160 Md. 156, 153 A. 403, 411 (1931) (noting that "the meaning will not be controlled by punctuation or capitalization, if the intention of the testat[or] can otherwise be ascertained"); *Winkel v. Streicher,* 365 Mo. 1170, 295 S.W.2d 56, 59 (1956) (also noting that "the natural sense in which words are used … prevails over both punctuation and capitals") (citation and internal quotation marks omitted).

In the instant case, the capitalization of the word "And" does not indicate an intent to treat income and corpus distribution differently.[18] Damon's intention as expressed in his will should not be controlled by a lone capitalized word inasmuch as a sound and reasonable construction of his will clearly supports the conclusion that income and corpus are to be distributed similarly. Moreover, the word "and" is "not correctly or generally used to express an alternative, unless followed by words which clearly indicate that intent." *In re Parant's Will,* 39 Misc.2d 285, 240 N.Y.S.2d 558, 561 (N.Y.Sur.1963) (citation omitted). Here, the appellants are essentially proposing that the income and the corpus distribution provisions follow two en-

---

**18.** As previously mentioned, the corpus distribution provision is contained in the fourth section of the will (*see supra* at 506–07, 128 P.3d at 819–20) and states:

… **And** on the death of the last survivor of all of my children and grandchildren who shall be living at the time of my death my trustees shall hold all of my said property of every description nature or kind whatsoever and wheresoever the same may be IN TRUST for all of my issue who shall then be living per stirpes and not per capita[.]

(Bold emphasis added.)

tirely different distribution schemes. However, Damon's use of the word "and" was not followed by words which clearly indicate such an intent. Thus, we believe that Damon did not employ the word "and" to express alternative, or different, distribution schemes for income and corpus. Accordingly, we hold that the circuit court did not err when it concluded that Damon's use of capitalization did not demonstrate or reflect an intent to treat the distribution of corpus differently from the distribution of income.

### 4. Holt & Baldwin Families' Contention that a General Testamentary Plan Exists in Damon's Will that Focuses on Grandchildren

 Holt & Baldwin Families assert that "Damon's 'per stirpes' direction should, consistent with his intent harmoniously indicated by all the language of his will, his general testamentary plan, and his surrounding personal circumstances, be construed to require division according to his grandchildren." Holt & Baldwin Families allege the following as Damon's testamentary plan:

> [Damon] created his [t]rust to preserve most of his estate for distribution to his later descendants at some distant point long after [Damon's children's] deaths. After choosing to delay distribution to this point, it is only natural that he would look to the generation of likely first takers as the stirpes to better spread his estate among these later descendants. Under the terms of his [T]rust and his circumstances, that generation would be his grandchildren's generation.

(Footnote omitted.) Sharon Damon Appellees contend that Holt & Baldwin Families "engage in various forms of speculation regarding Damon's intent." Sharon Damon Appellees point out that Holt & Baldwin Families' "general testamentary plan" has "no basis in the [w]ill" inasmuch as this group of appellants does not point to any language in the will that Damon intended for an equalization of corpus among his grandchildren and later descendants. M. Haig, C. Haig, and J. & W. Haig contend that there is no language in the will that supports a "uni-

form testamentary plan" favoring Damon's grandchildren.

In *Damon I*, this court had cautioned against the use of speculation or conjecture in determining the testator's intent:

> The appellees contend that when Damon wrote his will in 1914, eight years after this court held in *Fitchie [v. Brown*, 18 Haw. 52, 1906 WL 1362 (1906),] that a testamentary trust that was to continue "for as long a period as is legally possible" did not violate the [rule against perpetuities], he may have believed that in the absence of a specific termination date the court would automatically allow the trust to continue as long as legally possible. This contention, however, is purely speculative and not based on any language contained in the will. Because we "are to gather from the words of the will the intention of the testator, and to gather it not by speculation or conjecture as to what the testator may have intended, but by a sound and reasonable construction of the words which he has used," [*Id.*] at 70 (citation omitted), a construction of the will requiring us to find that Damon intended for the trust to continue "as long as legally possible" cannot be considered a reasonable construction.

*Damon I*, 76 Hawai'i at 127, 869 P.2d at 1346 (emphasis added) (some brackets omitted). Likewise, in the instant matter, a sound and reasonable construction of the words Damon used in his will do not support Holt & Baldwin Families' contention that Damon had a general testamentary plan favoring his grandchildren. On the contrary, Damon's income distribution provision places an emphasis on maintaining equal distribution of income among his children's families, with Damon's children as the stirpital root, not Damon's grandchildren. Indeed, Holt & Baldwin Families' allegation that it would be "only natural that [Damon] would look to the generation of likely first takers as the stirpes to better spread his estate among these later descendants" is purely speculative and not based on any language contained in the will. Thus, based on the foregoing, Holt & Baldwin Families' contentions are without merit. Accordingly, we hold that the circuit court correctly rejected Holt & Baldwin Families'

arguments that the corpus distribution provision should be "harmonized" with the will and that the stirpital root begins at the level of Damon's grandchildren.

### 5. Law of Intestate Succession

██ Finally, M. Haig argues that the circuit court erred when it concluded that Hawaii's intestacy law did not apply to the corpus distribution provision inasmuch as Damon failed to direct that there ever be a corpus distribution, and, thus, Damon's will is silent as to the disposition of corpus at termination. Consequently, M. Haig maintains that Damon's will fails to completely dispose of his property and that, therefore, Hawaii's intestacy statute governs the distribution of the failed gift.

Sharon Damon Appellees counter that M. Haig's contention that Damon died partially intestate ignores this court's long-standing presumption against partial intestacy. Sharon Damon Appellees assert that M. Haig's argument "ignores the language of Damon's [w]ill requiring that the [t]rust be distributed 'for all of my issue who shall then be living per stirpes and not per capita,' a clear description of the class members to receive corpus." Both Snow Appellees and Spee Appellees also contend that Hawaii's intestacy statute should not apply to the corpus distribution provision because Damon expressly provided a manner of distribution as this court already recognized in *Damon I.*

In *Damon I,* this court recognized that:

Damon directed that upon the death of the last measuring life the property be held only for his "issue who shall then be living." On its face, that language limits the beneficiaries to persons alive at that time and excludes any issue born after the death of the last measuring life. By precisely defining the beneficiaries as those issue living at the time of the death of the last measuring life, placing no limits on the duration of their status as beneficiaries, and failing to specify any subsequent beneficiaries, Damon's instructions appear to direct transfer of the estate in trust for the specified beneficiaries absolutely.

76 Hawai'i at 125, 869 P.2d at 1344 (citation omitted). Based on the foregoing and viewing Damon's will as a whole, *Damon I* held that there were "strong indications that Damon intended that the trust terminate upon the death of the last measuring life." *Id.* at 126, 869 P.2d at 1345.

Given the holding in *Damon I,* it is difficult to comprehend that M. Haig continues to adhere to the notion that Damon's will is "silent" as to whether he ever intended a distribution of the corpus. Nevertheless, as previously stated, Damon expressly specified the manner of distribution, *i.e.,* "per stirpes and not per capita," and, thus, the law of intestate succession is inapplicable to the instant case. Moreover, the contention that Damon's will fails to completely dispose of his property is contrary to Hawaii's public policy that "the law abhors intestacy and presumes against it," *Matter of Ikuta's Estate,* 64 Haw. 236, 245, 639 P.2d 400, 406 (1981) (internal quotation marks and citation omitted), inasmuch as there is language in Damon's will that expressly provides for a manner of distribution. Accordingly, we hold that the circuit court correctly concluded that the intestacy laws of Hawai'i are inapplicable to the instant case.[19]

## IV. CONCLUSION

Based on the foregoing, we affirm the circuit court's June 21, 2002 amended judgment in favor of Appellees.

---

19. Appellees also raise on appeal that M. Haig is judicially estopped from arguing that: (1) income and corpus should be distributed differently; (2) the corpus distribution provision does not provide for distribution of the trust; and (3) Damon's will is ambiguous as to which generation should serve as the stirpital root. Appellees contend that inasmuch as M. Haig takes inconsistent positions in *Damon I* and in the present appeal, M. Haig has "blown hot and cold" during the course of litigating the interpretation of Damon's will. However, inasmuch as many of the appellants raise similar and overlapping arguments on appeal, this court need not address this issue.